**POWERS et al. v. BOWLES, Price Adm'r.**

**No. 127.**

United States Emergency Court of Appeals.
Heard at Fresno May 27, 1944.

Decided Aug. 4, 1944.

Writ of Certiorari Denied Oct. 23, 1944.

See 65 S.Ct. 93.

Strother P. Walton, of Fresno, Cal., for complainants.

John O. Honnold, Jr., Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Nancy Fraenkel Wechsler and Marcella R. Schultz, Attys., Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MARIS, Chief Judge.

By Amendment No. 4 [1] issued August 19, 1943, table grapes were brought within the coverage of Maximum Price Regulation No. 426 [2] and maximum prices were established for sales to all persons other than consumers. The maximum prices established for sales f. o. b. shipping point for shipment out of California were $2.05 per lug box of 28 pounds effective from August 1 to October 31; $2.30 per lug box effective from November 1 to December 31; and $2.60 per lug box effective from January 1 to the end of the season. The maximum prices for sales at the basing point, Bakersfield, California, were 15 cents higher per lug box so as to cover refrigeration and other shipping expenses exclusive of freight.

The complainant Powers is a grower of California table grapes of the Malaga and Emporer varieties. The complainant Urick is a grower and packer of California table grapes which he ships under the trade name "Poinsettia". In a joint protest filed September 27, 1943, each objected to the maximum prices established by Amendment 4 as applied to his commodity. The protest was denied by the Administrator February 2, 1944. The complaint in this court was filed March 3, 1944.

The complainants urge that the Regulation, as amended, is in violation of Section 3 of the Stabilization Act of 1942 [3] in that the maximum prices established by the amendment were below the minimum level fixed by that section and in that the Administrator in fixing the maximum price failed to establish any differentials for grades or adequate differentials for seasonal sales. They also urge that the Administrator's failure to construe alleged existing grade, variety and brand differentials violated paragraph (h) of Section 2 of the Emergency Price Control Act of 1942.

Section 3 of the Stabilization Act provides in this connection:

"No maximum price shall be established or maintained for any agricultural commodity under authority of this Act or otherwise below a price which will reflect to producers of agricultural commodities the higher of the following prices, as determined and published by the Secretary of Agriculture—

"(1) The parity price for such commodity (adjusted by the Secretary of Agriculture for grade, location, and seasonal differentials) or, in case a comparable price has been determined for such commodity under and in accordance with the provisions of section 3(b) of the Emergency Price Control Act of 1942, such comparable price (adjusted in the same manner), or

"(2) The highest price received by such producers for such commodity between January 1, 1942, and September 15, 1942 (adjusted by the Secretary of Agriculture

[1] 8 F.R. 11589.

[2] 8 F.R. 9546.

[3] Section 3 of the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 963, superseded paragraphs (a) and (c) of Section 3 of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 903(a, c),

upon the suspension of the latter by the President on October 3, 1942, by Executive Order No. 9250, 50 U.S.C.A.Appendix, § 901 note, 7 F.R. 7871, pursuant to authority conferred upon him by Section 2 of the Stabilization Act, 50 U.S.C.A.Appendix, § 962.

for grade, location, and seasonal differentials), or, if the market for such commodity was inactive during the latter half of such period, a price for the commodity determined by the Secretary of Agriculture to be in line with the prices, during such period, of other agricultural commodities produced for the same general use; * * *."

The maximum prices fixed by the Administrator must therefore be at least as high as the parity or 1942 prices, as published by the Secretary of Agriculture, whichever is the greater. Since it is conceded that the 1942 prices for table grapes exceeded their parity prices we have no concern with the latter in this case, but need consider only the 1942 prices specified in subparagraph (2) of Section 3.

The Administrator stated at bar that in constructing his maximum price of $2.05 per lug he added to the 1942 average price received by growers of California table grapes an allowance of 88 cents per lug for packing and other expenses incurred prior to the point at which the maximum prices were applicable and a margin of 37 cents per lug to protect growers of the more expensive grades and varieties of table grapes. The evidence indicates that the packing and other pre-shipping point expenses amount to 84.7 cents per lug. Deducting this figure from the maximum price of $2.05 per lug leaves $1.203 per lug as the grower's return under that price. The 1942 prices upon which the Administrator constructed his maximum prices were published in a bulletin entitled "Prices Received by Growers for Fruit and Nut Crops" (Nov. 1943) issued by the Bureau of Agricultural Economics of the Department of Agriculture. It is there disclosed (p. 14) that the growers of California table grapes in the year 1942 received an average price of $57.10 per ton. Since there are 71.4+ lugs in a ton this represented an average price of 79.9 cents per lug. The return to the grower of $1.203 under the maximum price of $2.05 per lug is thus seen to be 50% in excess of the 1942 price to the grower which the statute fixed as a minimum.

It is urged that Section 3 contemplates the use as a minimum of the highest price received in the 1942 period and that the average price for the year was necessarily lower than this. The adjustment, determination and publication of the highest 1942 price is confided by the act to the Secretary of Agriculture, however, and the figure of $57.10 per ton is the one which he published. But if we assume, without deciding, that the Secretary should have published other than average prices the complainants are not helped. Complainant Powers puts forward Emperors, one of the varieties which he grows, as an example of a variety which commanded higher than average prices in 1942 and he argues that those higher prices, if considered, would render the Administrator's maximum prices invalid under Section 3. But the evidence in the record indicates that the shipping point prices for Emperors for the week ending October 17, 1942, the closest to the statutory period, ranged from $1.50 to $1.80 per lug. It thus appears that the highest 1942 price received for Emperors was substantially less than the comparable shipping point maximum price of $2.05 per lug fixed by the Administrator. The margin is even greater when it is recalled that Emperors are normally a late season variety and therefore have the advantage of the late season maximum prices of $2.30 and $2.60 per lug.

The complainants, however, assert that Section 3 requires the maximum prices to include an increase over the 1942 prices which the Administrator did not include, and they contend that his failure to do so renders the maximum invalid, at least as to higher priced varieties such as Emperors. They rely on the proviso contained in Section 3 that "modifications shall be made in maximum prices established for any agricultural commodity * * * where by reason of increased labor or other costs to the producers of such agricultural commodity incurred since January 1, 1941, the maximum prices so established will not reflect such increased costs." Their contention is that a 60% increase in labor costs has taken place since 1942 and that the maximum prices must under the statutory proviso just quoted be raised to a point which will reflect this increase over and above the highest 1942 prices. We think that in this contention they misconstrue the statute. Its mandate is that the maximum prices shall be adjusted to reflect cost increases since January 1, 1941. This means that the maximum must be adjusted so as never to be less than the prices on January 1, 1941, plus increases in labor and other costs to the producers incurred since that date. It does not mean that the maximum

must necessarily be increased if it is found to be less than the 1942 price plus increases in cost of production since 1942. For the increase in price between January 1, 1941 and the statutory period in 1942 may have reflected more than the increased costs incurred in the interim. It may also have involved an inflationary element of unreasonably increased profits.

The record in this case is bare of evidence as to the total increase in labor and other costs to the producers since January 1, 1941. Consequently, we are without data to which to apply the statutory mandate which is here relied on. All that appears in the case of Emperors is that their prices increased from 1940 as follows:

| | |
|---|---|
| 1940 | $0.62½ to $0.75 per lug |
| 1941 | .95 to 1.05 per lug |
| 1942 | 1.50 to 1.80 per lug |
| 1943 maximum price | 2.05 per lug |

These figures indicate that the maximum price in 1943 was 173⅓% greater than the highest reported 1940 price for Emperors. This increase may well have been sufficient to reflect fully the increase in producer's costs during the three years. ·

We conclude that the complainants have failed to meet their burden of proving that the maximum prices allowed them by the Regulation, as amended, are below the minimum prices set by Section 3 of the Stabilization Act of 1942.

The complainants interpret Section 3 of the Stabilization Act as a statutory mandate to the Administrator to make provision for grade, location and seasonal differentials in fixing maximum prices for agricultural commodities. We find no such mandate in the statute. Section 3 makes it quite clear that the duty to determine and publish the parity prices and the highest prices received within the period between January 1, 1942 and September 15, 1942, which are to become minimum prices for agricultural commodities for the purposes of price control, is imposed upon the Secretary of Agriculture and not upon the Price Administrator. It is for the Secretary of Agriculture to make adjustments for grade, location and seasonal differentials in determining these minimum prices.

It is, of course, true that the Administrator must be guided by these minimum prices in fixing his ceiling prices for any agricultural commodity. But the direction to the Administrator contained in Section 3 of the Stabilization Act is merely that in fixing the maximum price for an agricultural commodity he shall not go below the minimum prices for that commodity so determined and published by the Secretary of Agriculture. If a uniform maximum price for an agricultural commodity which allows for no grade, location or seasonal differentials is nevertheless generally fair and equitable and in accord with the other requirements of the Emergency Price Control Act it may be established by the Administrator provided it is higher than the highest parity or 1942 prices determined and published by the Secretary of Agriculture for that commodity for any grade, location or season. Here the Administrator made adjustments in the maximum prices for seasonal differentials but not for grades. Since, as we have seen, the maximum prices which he fixed were higher than the prices determined and published by the Secretary of Agriculture for all grades covered by the maximum prices we cannot hold that the latter violated Section 3 of the Stabilization Act in this respect.

It remains for us to consider whether the uniform price fixed by the Administrator for California table grapes, with differentials only for seasonal sales, was generally fair and equitable, or whether his action in establishing such a level price for the industry was arbitrary or capricious. We will consider also at this point the complainants' contention that the Administrator's failure to continue alleged existing grade, variety and brand differentials compelled changes in the business practices, cost practices and means and aids to distribution established in the industry contrary to paragraph (h) of Section 2 of the Emergency Price Control Act.[4] It may be stated here that although some suggestion was made that the seasonal differentials which the Administrator did provide were inadequate, the record contains no evidence to support the suggestion. We, therefore, need not consider it further.

---

4 "(h) The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act." 50 U.S.C.A.Appendix, § 902(h).

The decision against establishing price differentials based upon varieties was reached by the Administrator after consultation with representatives of the industry. At the request of the War Food Administrator the California table grape growers selected an industry committee to discuss their problems with him and with the Price Administrator. In a statement dated July 12, 1943, this committee expressed itself as opposed to price regulation for table grapes. However, the committee recommended that if price ceilings were to be imposed there should be one over-all ceiling for all varieties of table grapes. The committee said: "We recognize such an over-all price ceiling would have to be relatively high, but we are of the opinion that any price ceilings by varieties would be so complicated and so difficult of enforcement they would break down completely. Neither the Government nor our industry can afford to have such an eventuality occur." The committee pointed out that the table grapes grown in California comprise over 12 major varieties, with about 20 minor varieties in addition, and that the harvest season extends from late June until early December.

The reasonableness of the decision of the Administrator not to include in the Regulation price differentials for varieties is further borne out by the actual prices realized at auction in the eastern markets over a period of years for the various varieties of California table grapes. The record discloses that the average prices received for each of 8 major varieties in the years 1936 to 1942 inclusive were as follows:

| | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 | 1942 |
|---|---|---|---|---|---|---|---|
| Almeria | 1.70 | 1.59 | 1.80 | 1.72 | 1.86 | 2.13 | 3.04 |
| Cornichon | 1.36 | 1.18 | 1.07 | 1.11 | 1.13 | 1.43 | 2.03 |
| Emperor | 1.54 | 1.36 | 1.43 | 1.36 | 1.29 | 1.69 | 2.82 |
| Malaga | 1.28 | 1.13 | 1.09 | 1.12 | 1.09 | 1.35 | 1.81 |
| Red Malaga | 1.71 | 1.53 | 1.43 | 1.44 | 1.33 | 1.97 | 2.81 |
| Ribier | 1.70 | 1.49 | 1.53 | 1.44 | 1.58 | 1.87 | 2.48 |
| Thompson Seedless | 1.53 | 1.48 | 1.36 | 1.36 | 1.44 | 1.73 | 2.47 |
| Tokay | 1.37 | 1.19 | 1.15 | 1.11 | 1.17 | 1.43 | 1.99 |

These prices, are, of course, not comparable to the f. o. b. shipping point prices with which we are concerned in this case since they reflect additional charges for refrigeration, freight and selling expense, as well as handler's profits. They do, however, disclose that over the years shown there has been no consistent pattern of price differentials as between the various varieties of table grapes and they negative the suggestion that there has been any consistent practice in the industry of pricing the various varieties of table grapes in any fixed relation to each other. To cite one example out of the 8 varieties shown, Emperors brought the second highest prices in 1942, they were third in 1938, fourth in 1936 and 1939, and fifth in 1937, 1940 and 1941.

What has been said sufficiently disposes of the contention of complainant Powers that the Emperor variety of grapes which he grows should command a higher price than other varieties, such as Malagas. It is doubtless true, as his affidavit discloses, that under the same conditions an acre of Malaga vineyard will produce a larger quantity of grapes than an acre of Emperor vineyard and that Emperors are subject to special hazards of rain and frost. It is also true, however, that these special hazards result from the fact that Emperors are ordinarily harvested relatively late in the season. The Administrator may well have thought that the higher maximum price which he fixed for late season sales would sufficiently compensate for these hazards.

The same considerations which justified the elimination from the Regulation of differentials for varieties support the elimination of differentials based on grades or brands. Moreover, complainant Urick who made the specific charge that the Regulation unlawfully discriminates against the grapes which he sells under the brand name "Poinsettia", has offered no evidence to establish this contention. We therefore need not give it further consideration.

We conclude that it cannot be held upon the record in this case that the action of the Administrator in fixing a uniform maximum price for all California grapes, subject only to differentials for seasonal sales, was arbitrary or capricious or that it brought about a change in any established business practice in the industry. It follows that the Regulation as amended does not violate either Section 3 of the Stabilization Act or Section 2(h) of the Emergency Price Control Act.

The final argument of the complainants which requires discussion is that the provisions of the Emergency Price Control Act of 1942 governing procedure and court review are inadequate to preserve the right guaranteed to them by the Constitution that their property be not tak-

en without due process of law. They point to the fact that the grape crop is seasonal and perishable, that the shipping season for California table grapes is limited; that since the Regulation was issued in August and the Administrator did not deny the protest until February the entire crop had to be disposed of before the Administrator acted in regard to the relief sought by the complainants. In essence their argument is that the failure to provide for interlocutory relief as to a seasonal, perishable commodity is equivalent to a denial of all relief. This argument was answered in Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, where Chief Justice Stone pointed out that Congress in the exercise of the power to protect the national economy from the disruptive influences of inflation may prohibit the use of restraining orders or other interlocutory relief as it has done by paragraphs (c) and (d) of Section 204 of the Emergency Price Control Act.

If it appears that the Administrator is not acting with the expedition required by the circumstances of the case a protestant may petition this court to direct the Administrator to take final action within a reasonable time. Safeway Stores v. Brown, Em.App.1943, 138 F.2d 278, certiorari denied 320 U.S. 797, 64 S.Ct. 266; R. E. Schanzer, Inc., v. Bowles, Em.App.1944, 141 F.2d 262. See Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, Note 7.

We have examined the other contentions of the complainants but in view of what has been said we find it unnecessary to discuss them.

The complaint is dismissed.