**MORA et al. v. TORRES, Secretary of Agriculture and Commerce of Puerto Rico.**

No. 8426.

United States District Court, D. Puerto Rico, San Juan Division.

June 19, 1953.

Rafael Castro-Fernandez and Francisco Castro Amy, San Juan, Puerto Rico, for plaintiffs.

Aurelio Torres Braschi, Edgar S. Belaval and J. Trias Monge, San Juan, Puerto Rico, for defendant.

ORTIZ, Acting District Judge.

In this complaint for injunction it is prayed that an injunction be issued against the defendant, Ramon Colon Torres, as Secretary of Agriculture of Puerto Rico, enjoining him from enforcing or instituting any proceedings to compel compliance with Administrative Order No. 228 of May 12, 1953, fixing the maximum price for the sale of rice by anyone of the plaintiffs. A hearing was held on June 11, 1953, as to the issuance of a temporary injunction. This Court now formulates the following conclusions:

### Jurisdiction

This Court has jurisdiction over this action, for

(a) this is a case arising under the Fifth Amendment of the United States, applicable herein, and

(b) The matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs.

### Findings of Fact

(1) Plaintiff, a citizen of the United States, is an importer and wholesaler of rice, in Puerto Rico and the larger part of his business is devoted to the importation

and wholesale of rice. The defendant is the Secretary of Agriculture and Commerce of the Commonwealth of Puerto Rico.

(2) On August 14, September 8, September 13 and October 1, 1952, plaintiff, as purchaser, made and executed several contracts for the sale and purchase of a total of 6400 bags of rice, of 100 pounds each, with several rice growers domiciled in the Continental United States, to wit, the Rice Growers Association of California, the Farmers Rice Growers Cooperative, of California, and Rosenberg Bros. and Co., of California. Under those contracts deliveries were and are to be made through shipments to Puerto Rico during each of the two halves of each month, beginning in the first half of January, 1953, and ending in the second half of August, 1953, said dates of deliveries fluctuating in accordance with the terms of each of the respective six contracts in evidence. No fixed purchase price was set in any of those contracts. The purchase price was, and is, an "open price", that is, it was and is to be measured by the market price prevailing in the Continental United States at time of shipment, plus any increase in freight or insurance, C. I. F. San Juan.

(3) On March 12, 1953, defendant, pursuant to Act No. 228 of May 2, 1942, of Puerto Rico, as amended, issued an Order entitled: "Administrative Order No. 228, of the General Supplies Administration," fixing the maximum price for the sale of rice in Puerto Rico, said order to be effective on March 16, 1953, establishing in part, and as said order affects plaintiff herein, the following schedule of maximum prices, as to wholesale price per 100 pounds:

(a) For rices of superior quality, short and long grain, classified as "extra choice", "fancy" or "extra fancy", which is 15% or less broken, a maximum wholesale price per 100 pounds of $12.90.

(b) For rices of good quality, short or long grain, classified as "choice" or "medium", which is more than 15% or less than 40%, a maximum wholesale price per 100 pounds of $12.25.

(4) Said order was based, expressly, on the following determinations of facts and policy.

"The progressive decontrol of prices in Continental United States could bring about a disruption of the market and of the economy of Puerto Rico and, for that reason, its effects are observed daily by the Secretary of Agriculture and Commerce of the Commonwealth of Puerto Rico.

"Rice is the main basic product in the diet of the Puerto Rican consumers strongly affected by the federal decontrol of prices.

"Rice is the most important staple in the diet of the Puerto Rican consumer and especially of those of lowest income, and this commodity began to show a price increase as soon as it was decontrolled in Continental United States. The initial change has been such that an unjustifiable and disproportionate price increase is imminent. * * *"

(5) At the time said order became effective, that is, on March 16, 1953, plaintiff had already actually received 1400 bags of rice under the contracts referred to, of which 1400 bags he had received 1000 bags of superior quality, 15% or less broken, at a purchase price of $13.25 (market price at time of shipment plus any increase in freight or insurance), and 400 bags of 39% rice at a purchase price (market price, etc.) of $12.45. On the effective date of the order plaintiff had in stock all of said rice. After the effective date of the order plaintiff was and is to receive 5000 more bags of rice, under the contracts referred to, last shipment to be made on the second half of August.

(6) As to each and everyone of the bags of rice actually received, or shipped or paid for at the time the order became effective and at the time the complaint in this case was filed, there is a difference of fifty cents per bag between the purchase price paid by plaintiff and the prices fixed by the defendant, which latter is 50 cents less than the purchase price already paid. If plaintiff were to sell said rice at the prices fixed by the defendant, he would lose 50 cents on each bag and he would al-

so lose the opportunity of making a profit of 84 cents per bag on 15% superior quality rice and 73 cents per bag on 40% rice.

(7) On March 21, 1953, plaintiff and other importers of rice moved the defendant for reconsideration of its Order, attacking the order as confiscatory and violative of the commerce clause of the constitution of the United States. On April 27 a hearing was granted by the defendant and the plaintiff and other rice importers appeared personally, made objections to the Order and presented in evidence proofs of the stocks they had on hand, the purchase price paid for the same, and the above mentioned contracts then and still in force. At said hearing, motion was made to the defendant for an issuance of an order of supersedeas or suspension of the Order until final determination of the validity of the Order. On May 29, 1953, defendant denied the motion of reconsideration of Order 228, and refused to grant the supersedeas requested. On that same date an appeal was taken from the Order and the determinations of the defendant to the Superior Tribunal of Puerto Rico pursuant to the Act above mentioned and defendant was notified of said appeal. Said appeal is still pending and the complete record of the proceedings before the defendant as to said order has not as yet been filed in the Superior Tribunal.

(8) On or about April 23, 1953, the California Rice Growers Association made an offer to plaintiff, of cancellation of the pending contracts with that firm, as to future deliveries in May, June, July and August, 1953, but not as to rice already delivered, shipped or paid for prior to May, 1953. Plaintiff refused to accept that offer of cancellation, on the basis of his allegation that he would have to go out of business, inasmuch as the sale of rice constituted the greater part of his business. At the time the offer of cancellation was made, plaintiff had in stock 1200 bags plus 800 he was to receive before May, and thus, he would have 2000 bags not subject to the offer of cancellation. Farmers Rice Growers Cooperative, and Rosenberg Bros. & Co. did not make any offers of cancellation to plaintiffs, as to the contracts pending with them.

(9) Rice is a perishable commodity and, in Puerto Rico, there is a maximum limit of three months within which rice may be conserved without deterioration. Plaintiff has had to fumigate his rice in stock, to change it among different bags and to kill the weevils in the rice. Continued handling of rice affects its quality and value.

(10) Three million bags of rice, of 100 pounds, are imported annually in Puerto Rico, 250,000 bags being consumed monthly in this Island. There has been no shortage of rice in Puerto Rico throughout this year.

(11) No marketing quotas nor acreage allotments as to rice have been instituted by the United States Government as to the crops of rice for the years 1952, 1953, inasmuch as the supply of rice is not excessive. Federal Register, Vol. 16, No. 234, P. 12211, paragraph 730, point 302, Vol. 17, number 243, P. 11303, paragraph 730, point 402.

(12) Rice is a basic and most important product and staple in the diet of Puerto Rican consumers, especially in the lower income groups, which comprise the great majority of Puerto Ricans.

### Conclusions of Law

(1) Order No. 228 of March 12, 1953 is not clearly confiscatory nor arbitrary nor does it clearly deprive plaintiff of his property without due process of law.

(2) The facts in this case do not justify the issuance of an injunction.

(3) The lack of injunctive relief in this case does not deprive plaintiff of his property without due process of law.

(4) The 14th Amendment and the Interstate Commerce clause of the Constitution of the United States are not applicable to this case.

### Opinion

It is the obligation of this Court to decide, in the first instance, whether it has jurisdiction to issue an injunction on the basis of the alleged applicability of the Fifth and Fourteenth Amendment, and

the Interstate Commerce Clause of the Constitution of the United States. This Court has jurisdiction of all actions wherein the matter in controversy exceeds the sum or value of $3,000 exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States. 28 U.S.C.A. § 1331. Before the enactment by the 81st Congress of the United States of Public Law 600, approved July 3, 1950, 48 U.S.C.A. § 731b et seq., and the approval and adoption by the people of Puerto Rico of the Constitution of the Commonwealth of Puerto Rico, the Fifth Amendment of the Constitution of the United States was applicable to Puerto Rico, and jurisdiction of this Court as to cases involving an alleged deprivation of property without due process of law was based on said amendment and on the Bill of Rights contained in the Organic (Jones) Act of Puerto Rico, of 1917. 48 U.S.C.A. § 731 et seq. Arroyo v. Puerto Rico Transportation Authority, 1 Cir., 164 F.2d 748; Balzac v. Porto Rico, 258 U.S. 298, 312, 313, 42 S.Ct. 343, 66 L. Ed. 627; People of Puerto Rico v. Eastern Sugar Associates, 1 Cir., 156 F.2d 316, 321, 322; Thornberg v. Jorgensen, 3 Cir., 60 F.2d 471; Munoz v. Porto Rico Ry. Light & Power Co., 1 Cir., 83 F.2d 262; Gallardo v. Questell, 1 Cir., 29 F.2d 897; Gallardo v. Santini Fertilizer Co., 1 Cir., 11 F.2d 587, 588, vacated on other grounds in 1 Cir., 16 F.2d 368. The Fifth Amendment was considered as a restriction on the exercise by the Congress of the United States of its plenary powers over Puerto Rico, under Art. 4, section 3 of the Constitution of the United States. Cases v. United States, 1 Cir., 131 F.2d 916, 919, 920; People of Puerto Rico v. Eastern Sugar Associates, supra, 156 F.2d at page 322. "A fortiori", said amendment also operated as a restriction on the exercise of powers by the Government of Puerto Rico, which was considered as an agency, dependency and territorial possession of the United States, and whose governmental functions were delegated to Puerto Rico by the Congress of the United States. Cf., Farrington v. Tokushige, 273 U.S. 284, 299, 47 S.Ct. 406, 71 L.Ed. 646;

and see Thornberg v. Jorgensen, supra; Soto v. United States, 3 Cir., 273 F. 628; Sancho v. Corona Growing Corp., 1 Cir., 89 F.2d 479, 481.

The question now presented before this Court is whether the Fifth Amendment is still applicable to Puerto Rico, in view of the new relationship established between the United States and Puerto Rico under Public Law 600, the Federal Relations Act incorporated therein and the Constitution of the Commonwealth of Puerto Rico. I believe that the previous basis of applicability of the Fifth Amendment has disappeared and has been legally eliminated. The government is no longer an agency of the Government of the United States nor does it exercise any longer its powers by way of delegation of the Federal Government. It is not now a dependency, possession nor territory of the United States. Those conclusions are based on the following factors:

(1) A new type of relationship has been created. Cf. Senator Lehman's statements in the Senate, Congressional Record, Vol. 98, No. 110, June 23, 1952, P. 7973, Vol. 98, No. 117, July 1, 1952, P. 8906.

(2) Under that new relationship, and as we shall see later, a compact has been established between the government of the United States and the people of Puerto Rico, by virtue of which the latter has adopted and approved its own Constitution, not subject to amendment by the Congress of the United States, and by virtue of which compact the people of Puerto Rico have accepted and approved Public Law 600 and the Puerto Rican Federal Relations Act, incorporated in and made a part of Public Law 600. As a necessary legal consequence of said compact, neither the Congress of the United States nor the people of Puerto Rico can unilaterally amend Public Law 600 nor the Puerto Rican Federal Relations Act without the consent and approval of the other party to the compact.

(3) Under the new relationship now existing, Puerto Rico enjoys the total substance of self government and there is a plentitude of government by consent, which

realities are incompatible with the previous status of Puerto Rico as a possession, dependency or territory.

(4) All throughout the discussions and debates in the Congress as to Law 600 and the Constitution of the Commonwealth of Puerto Rico, it appears that one of the predominant purposes was to eliminate the vestiges of colonialism in Puerto Rico, and to give complete powers of self government to that community. Vol. 98, Congressional Record, May 13, 1952, P. 5207, 5208, wherein Resident Commissioner Fernos Isern states that "this is not an Organic Act but a Constitution", P. 5209, P. 5211, wherein the then Majority Leader, Congressman McCormack stated: "This is a new experiment; it is a turning away from the territorial status; it is something intermediary between the territorial status and statehood." See also 98 Congressional Record, Vol. 83, May 15, P. 5342 and statement by Senator O'Mahoney, then chairman of the committee on Interior and Insular Affairs of the Senate, in 98 Congressional Record P. 7967–7969, June 23, 1952. See also Conference Report as to H.J.Res. 430, as to the approval of the Constitution of the Commonwealth of Puerto Rico, Report No. 2350 of June 28, 1952, Statement of the Managers, in which it is said as follows: "The conferees believe that in keeping with the spirit of Public Law 600, 81st Congress, and the purposes of the Puerto Rican Constitution, the people of Puerto Rico should have freedom to change their constitution within the limits of applicable provisions of the United States Constitution, the Puerto Rican Federal Relations Act, Public Law 600, 21st Congress and House Joint Resolution 430. Congressman Aspinall stated, in P. 6204, 98 Congressional Record, No. 92, of May 28, 1952, as follows: This procedure is something entirely new in the history of the Government of the United States. We are not treating Puerto Rico as a state and we are not treating Puerto Rico as a possession. We are trying to treat Puerto Rico as something in between which will cement her friendship to the people of the United States."

(5) Some positive acts of the Congress reinforce the inference that Puerto Rico is no longer a dependency nor a territorial possession of the United States. On May 28, 1952, the House of Representatives rejected an amendment to the Constitution of Puerto Rico, presented by Congressman Meader, to the effect that nothing in that Constitution should be construed as an irrevocable delegation, transfer or release of the power of the Congress over Puerto Rico granted under Article 4, section 3 of the Constitution of the United States. 98 Congressional Record 6203 et seq. We shall discuss that matter later, but, in passing, we may say that said rejection implies a Congressional purpose of non-interference with the powers of the government of Puerto Rico under its Constitution. The same inference validly arises from the rejection by the Congress of Senator Johnston's two amendments as to the limitations on the term of the Governor of the Commonwealth of Puerto Rico and as to the proposed retention by the Congress of a power to approve any amendment made by the people of Puerto Rico to its Constitution. 98 Congressional Record P. 7377 et seq., June 23, 1952; P. 8995 et seq., July 1, 1952. That determined purpose of non-interference by Congress and the resulting reality as to the exclusive power of the people of Puerto Rico to amend its own Constitution without intervention by the Federal government, subject to some limitations which do not affect the nature of the relationship, imply and spell-out a negation of a status of dependency or possession or territory.

(6) Under Law 600 the previous power of the Congress to annul laws approved by the Legislature of Puerto Rico was expressly repealed and eliminated. Of course, such power, in general, may exist without any express proviso to that effect, but that power may be granted away. 49 American Jurisprudence 335, Section 126. It was clearly the intention of Congress as to that clause to deprive itself of that power, and that deprivation was within the terms of the compact made with the people of Puerto Rico.

I think it is essential to discuss in more detail my conclusion that a compact has been established between the people of Puerto Rico and the government of the

United States, which precludes a unilateral amendment of the Puerto Rican Federal Relations Act by either party to the compact. In substance, that conclusion is supported by the following factors:

(1) Public Law 600 expressly provides that said Act is in the nature of a compact. In adopting certain language, Congress should be presumed to have adopted also the previous construction given by the Courts to such language. Cf. Munoz v. Porto Rico Ry., Light & Power Co., supra. Congress could well have referred, by analogy, to the Compact Clause of the Constitution of the United States, which gives efficacy to compacts among the States, with consent of Congress. Of course, Puerto Rico is not a State, and the compact clause, as such, is not applicable to it. Probably that was the reason why Law 600 uses the phrase "in the nature of" a compact, that is, it is not a compact under the constitutional clause referred to, but it is analogous to such a compact among States, and the nature of both should be the same. In Virginia v. Tennessee, 148 U.S. 503, 519, 520, 13 S.Ct. 728, 734, 37 L.Ed. 537 it is said:

"Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States. * * Compacts or agreements—and we do not perceive any difference in the meaning, except that the word 'compact' is generally used with reference to more formal and serious engagements than is usually implied in the term 'agreement'—cover all stipulations affecting the conduct or claims of the parties."

Dealing with the same clause, in West Virginia ex rel. Dyer v. Sims, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713, it was held that an agreement solemnly entered into between states by those who alone have political authority to speak for the states can not be unilaterally nullified, nor is to be given its final meaning by an organ of one only of the contracting states.

(2) A very significant evidence of the existence of a mutually binding compact is the fact that a unique procedure was followed as to the approval and effectiveness of Public Law 600. The law provides that the Act was to be submitted to the qualified voters of Puerto Rico for acceptance or rejection. The legal effectiveness of the Act was made dependent on approval by the people of Puerto Rico in an island-wide referendum. The consent of Puerto Rico was a requisite to the effectiveness of the Act. A new relationship was created on the basis of the consent of Congress expressed through the Act and the consent of the people of Puerto Rico, expressed directly in a referendum. Such procedure conveys the essential ingredients of a compact, which was still more solemn in this case than in the case of compacts between states, inasmuch as Law 600 spells out a compact through the consent, not merely of a political organ of one of the contracting powers, but an entire people directly, by the human beings which constitute the community of Puerto Rico. Act 600 was approved in the referendum. By itself, the direct consent by the people should have juristic significance, and it was given expressly legal significance by the Congress in Law 600.

(3) As far as the intention of the people of Puerto Rico is concerned, in entering in the new relationship, we should note that the people, when it approved Law 600, understood that it was voting for a binding compact with the United States, and such was the representation made by those who participated in the pre-referendum campaign in favor of approval of the Act. The Annals of the American Academy of Political and Social Science, number of January, 1953, P. 1, 6 Development through Democracy, by Luis Muñoz Marin; and see Muñoz Amato, P. 23, 28: "When the people of Puerto Rico ratified the Law in a referendum, they understood that the federal relations clauses were included in the covenant, as had been emphasized by the leaders of the majority party".

A further expression of the intention of the people of Puerto Rico to enter into a

binding compact is found all throughout the deliberations of the Constitutional Convention of Puerto Rico, specially in the statements of the leader of the majority group prevailing in the convention, Governor Luis Muñoz Marin. See Record of the Convention, "Diario de Sesiones", P. 426, Report of the committee on the Preamble and Amendments to the Constitution; Muñoz Marin: P. 458 et seq., P. 884, 885 et seq. The Convention approved Resolutions 22 and 23, which clearly conveyed the understanding of the existence of a binding compact, not only as to the Constitution itself, but as to the Puerto Rican Federal Relations Act. Those resolutions read as follows:

"Resolution No. 22

"To determine in Spanish and in English the name of the body politic created by the Constitution of the people of Puerto Rico

"Whereas, this Constitutional Convention, in accordance with the mandate of the people, is about to adopt the Constitution by virtue of which the Puerto Rican community will be politically organized;

"Whereas, it is necessary to give an appropriate name in both English and Spanish to the body politic thus created;

"Whereas, the word 'commonwealth' in contemporary English usage means a politically organized community, that is to say, a state (using the word in the generic sense) in which politicial power resides ultimately in the people, hence a free state, but one which is at the same time linked to a broader political system in a federal or other type of association and therefore does not have an independent and separate existence;

"Whereas, the single word 'commonwealth', as currently used, clearly defines the status of the body politic created under the terms of the compact existing between the people of Puerto Rico and the United States, i. e., that of a state which is free of superior authority in the management of its own local affairs but which is linked to the United States of America and hence is a part of its political system in a manner compatible with its federal structure;

"Whereas, there is no single word in the Spanish language exactly equivalent to the English word 'commonwealth' and translation of 'commonwealth' into Spanish requires a combination of words to express the concepts of state and liberty and association;

"Whereas, in the case of Puerto Rico the most appropriate translation of 'commonwealth' into Spanish is the expression 'estado libre asociado', which however should not be rendered 'associated free state' in English inasmuch as the word 'state' in ordinary speech in the United States means one of the States of the Union;

"Therefore,

"Be it resolved by the Constituent Assembly of Puerto Rico:

"First: That in Spanish the name of the body politic created by the Constitution which this Convention is adopting for submission to the people of Puerto Rico shall be 'Estado Libre Asociado', it being understood that in our case this term is equivalent to and an appropriate translation of the English word 'commonwealth'.

"Second: That, as a consequence, the body politic created by our Constitution shall be designated 'The Commonwealth of Puerto Rico" in English and "El Estado Libre Asociado de Puerto Rico' in Spanish.

"Third: That the Committee on Style of this Convention is instructed to use these designations in the respective English and Spanish texts of the Constitution when submitting the documents for third reading.

"Fourth: That this resolution shall be published in Spanish and in English as an explanatory and authoritative statement of the meaning of the terms 'Commonwealth' and 'Estado Libre Asociado' as used in the Constitution; and that it shall be widely distributed, together with the Constitution, for the information of the people of Puerto Rico and the Congress of the United States.

"Resolution No. 23

"Final declarations of the Constitutional Convention of Puerto Rico

"Whereas, the Constitutional Convention of Puerto Rico, in fulfilling the important

mission assigned it by the people, has approved a Constitution for the Commonwealth of Puerto Rico within the terms of the compact entered into with the United States of America;

"Whereas, in accordance with the terms of the compact, said Constitution is to be submitted to the people of Puerto Rico for their approval;

"Therefore,

"Be it resolved by this Constitutional Convention:

"First: That, pursuant to the relevant regulations, a certified copy of the Constitution as approved be sent to the Governor of Puerto Rico so that he may submit it to the people of Puerto Rico in a referendum as provided by law.

. "Second: That copies of the Constitution be printed in Spanish and English, respectively, in numbers sufficient for general distribution to the end that it will become widely known.

"Third: That the following final declarations of this Convention be entered on its journal and also published:

"(a) This Convention deems that the Constitution as approved fulfills the mission assigned it by the people of Puerto Rico.

"(b) When this Constitution takes effect, the people of Puerto Rico shall thereupon be organized in a commonwealth established within the terms of the compact entered into by mutual consent, which is the basis of our union with the United States of America.

"(c) The political authority of the Commonwealth of Puerto Rico shall be exercised in accordance with its Constitution and within the terms of said compact.

"(d) Thus we attain the goal of complete self-government, the last vestiges of colonialism having disappeared in the principle of compact, and we enter into an era of new developments in democratic civilization. Nothing can surpass in political dignity the principle of mutual consent and of compacts freely agreed upon. The spirit of the people of Puerto Rico is free for great undertakings now and in the future. Having full political dignity the commonwealth of Puerto Rico may develop in other ways by modifications of the Compact through mutual consent.

"(e) The people of Puerto Rico reserve the right to propose and accept modifications in the terms of its relations with the United States of America, in order that these relations may at all times be the expression of an agreement freely entered into between the people of Puerto Rico and the United States of America.

"Fourth: That a copy of this resolution be sent to the President of the United States and to the President of the Senate and the Speaker of the House of Representatives of the Congress of the United States."

(4) As to the intention of Congress relative to the existence of a compact, it is surprising that there are relatively few references to the subject, when Law 600 and the Constitution of Puerto Rico were approved. Such as they are, they are not substantially incompatible with the establishment of a compact. Of course, Law 600 speaks for itself and, as we have seen, its terms and the procedure of its approval import a compact, and a clear contrary intention should be made manifest. It is true that, in the Report of the Committee on Public Lands of the House of Representatives, as to Law 600 (Report No. 2275, 81st Congress) it is stated that under that Act there would not be any fundamental change in the political relations between Puerto Rico and the United States. That phrase follows "verbatim" the expression used on the report to the committee submitted by the Department of the Interior. (As we shall see later, the executive branch of the government of the United States has interpreted the relationship as a compact.) That phrase should be read in its context, that is, in connection with the totality of the Report. Its meaning is then that Law 600 does not imply statehood nor any ultimate political status for Puerto Rico. On the other hand, it is relevant to note that, in considering the bill leading to Act 600, Senator O'Mahoney pointed out that the proposed legislation imported a compact. Hearing before a Sub-Committee of the Committee on In-

terior and Insular Affairs of the Senate, on May 17, 1950, on S. 3336, P. 14.

When the Constitution was submitted to Congress for approval, Resolutions 22 and 23 of the Constitutional Convention of Puerto Rico, already transcribed, were also formally submitted to Congress. The Congress was informed that Law 600 had been interpreted as a binding compact by the people of Puerto Rico and by the Convention. In recommending approval of the Constitution, the President of the United States also mentioned the nature of a compact, of the new relationship, which was based on "mutual consent and esteem". Thus put on notice as to that thesis, the Congress did not take any positive acts against that contention. Of course, the new contractual relationship had been already established under Act 600, but, in considering the Constitution, could have expressed, affirmately, its opposition to that concept. It did not do so. On the contrary, there were affirmative references to the idea of a compact. See Senator Lehman's statements, already cited, and Congressman Fernandez' affirmation of the existence of a compact. 98 Congressional Record 6204, May 28, 1952. Congressman Halleck, at that time Minority Leader, merely stated that he was not sure as to that point, and that "there is a difference of opinion in Puerto Rico as to whether this creates a separate commonwealth with a high measure of autonomy and independence, or whether these people still continue as a protectorate of the United States under the Basic Act".

In dealing with Congressman Meader's amendment already referred to, as to an express reservation of unilateral power on the part of the United States, that amendment was rejected, and the following objections were made:

(a) Law 600 was approved as a compact, and said amendment would be a breach of that contract.

(b) Congressman Donovan stated that an opinion to the effect that Congress had reserved all powers was "inadequate" (P. 6204).

(c) Said amendment was unnecessary, inasmuch as Congress was sufficiently protected by the Relations Act. That statement is compatible with the notion that such protection was protected by the necessity of intervention of the Congress in the amendment of the Relations Act. That intervention need not be exclusive. Bilateral intervention was not eliminated.

The reasons for the rejection of the Meader amendment can not be precisely fixed, but at least, said action fortifies the interpretation of the existence of a compact.

After the final approval and effectiveness, the Government of the United States notified the United Nations that it had decided to cease to transmit information on Puerto Rico, in view of the "change in the constitutional position and status" of Puerto Rico. Bulletin of the Department of State, Vol. 28, No. 721, April 20, 1953, P. 584 et seq. References are made to the compact existing between the United States and Puerto Rico, and it is stated that Puerto Rico has voluntarily entered into the relationship with the United States which it has chosen to describe as a "commonwealth relationship". It is finally said that "the United States Government, therefore, has decided that, with the entry into force on July 25, 1952, of the new constitutional arrangements establishing the Commonwealth of Puerto Rico, it is no longer appropriate for the United States to continue to transmit information to the United Nations on Puerto Rico under Article 73 (e) of the Charter. This conclusion constitutes a recognition of the full measure of self government which has been achieved by the people of Puerto Rico."

In that communication to the United Nations, the government adopts by reference the letter sent by the Governor of Puerto Rico to the President of the United States on January 17, 1953 (Bulletin cited, P. 588), in which the Governor states that the Constitution was adopted pursuant to a compact which controlled and determined all the relationship between the United States and Puerto Rico, and that "our status and the terms of our association with the Unit-

ed States can not be changed without our full consent."

The new relationship between the Commonwealth of Puerto Rico and the United States can not be precisely catalogued. It is not subject to any specific labels or categories, for it constitutes an innovation in the history of communities which were previously considered to be territories. A new pattern of government has been created. As cited by Chief Justice Snyder, of the Supreme Court of Puerto Rico (Hearings before the Committee of Public Lands of the House of Representatives, on May 16, 1950, Justice Frankfurter said in 1914, when he was serving in the Department of War in connection with Territorial Affairs, as follows:

"The form of the relationship between the United States and unincorporated territory is solely a problem of statemanship.

"History suggests a great diversity of relationships between a central government and dependent territory. The present day shows a great variety in actual operation. One of the great demands upon inventive statesmanship is to help evolve new kinds of relationship so as to combine the advantages of local self-government with those of a confederated union. Luckily, our Constitution has left this field of invention open."

In the positive side, the Commonwealth of Puerto Rico has entered into a voluntary association with the United States, on the basis of a compact, with the element of a common citizenship. Congress had the plenary power to make all needful rules and regulations as to Puerto Rico. It has exercised those powers by granting them away through a compact with the people of Puerto Rico.

■ Hence, the Fifth Amendment of the Constitution of the United States is no longer applicable on the basis that Puerto Rico is a possession, dependency or territory subject to the plenary power of Congress. But it continues to be applicable to Puerto Rico as part of the compact referred to. All throughout the history of

the legislation in discussion, reference is made to the "applicable provisions of the Constitution of the United States." When Law 600 and the Constitution of Puerto Rico were approved, the Fifth Amendment was considered by the Courts as being applicable to Puerto Rico. That judicial construction was incorporated impliedly into the terms of the compact, with the result that the constitutional guaranty as to due process of law continue to be enjoyed by American citizens in Puerto Rico, and can be protected by this Court as agreed to by the people of Puerto Rico. The agreement by the people of Puerto Rico that the Fifth Amendment should continue to be applicable here is not an agreement as to the territorial basis of such applicability, but it signifies a covenant that the constitutional rights established in that Amendment should have continued prevalence in Puerto Rico and should continue to be protected by this Court.

Incidentally, this Court has been considered as a territorial, and not as a Constitutional Court. Arroyo v. Puerto Rico Transportation Authority, supra. But its existence constitutes a part of the Puerto Rican Federal Relations Act, and hence, part of the compact involved in this discussion.

■ The 14th Amendment is not applicable to Puerto Rico, for Puerto Rico is not a federated State within the terms of said amendment of the Constitution of the United States. It was not considered a state before the establishment of the new relationship. Buscaglia v. Ballester, 1 Cir., 162 F.2d 805, 807; South Porto Rico Sugar Co. v. Buscaglia, 1 Cir., 154 F.2d 96, 101; People of Puerto Rico v. Eastern Sugar Associates, supra. The new political organization has not changed that rule.

■ The Interstate Commerce Clause is not applicable to Puerto Rico, Sancho v. Bacardi Corp. of America, 1 Cir., 109 F.2d 57 (reversed on other grounds in Bacardi Corp. of America v. Domenech, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98), Buscaglia v. Ballester, supra; Cases v. United States, supra, and it has not been made a part of the compact with Puerto Rico.

320

■ As to the jurisdictional amount in controversy in this case, it should be measured, not only by the actual loss to be suffered by the plaintiff if he sold under Order 228 (50 cents per bag), but also by the reasonable profits he would lose under the Order. That is, the measure should be the value of the right he could have exercised in the absence of the Order. Kroeger Grocery & Baking Co. v. Lutz, 299 U.S. 300, 57 S.Ct. 215, 81 L.Ed. 251. From that point of view, the requisite of jurisdictional amount is complied with. Cf. Gallardo v. Questell, 1 Cir., 29 F.2d 897.

■ As to the merits of this case, it should be remembered that we are not in the midst of a plenary proceeding to review the validity of the order. That proceeding is now pending before the Courts of Puerto Rico. We are engaged in an injunction proceeding in which we are requested to restrain the enforcement of the Order until it is finally reviewed and evaluated in the Courts of Puerto Rico. Under those circumstances, injunction should not issue, at least, in the absence of a diaphanous demonstration, not subject to any possible controversy, that the order is clearly and transparently confiscatory and arbitrary, specially where the exercise of the powers of a state or commonwealth are involved, and where great public interests are affected. Porto Rico Tel. Co. v. Puerto Rico Communications Authority, 1 Cir., 189 F.2d 39.

In the case of Mayo v. Lakelands Highlands Canning Co., 309 U.S. 310, 60 S.Ct. 517, 522, 84 L.Ed. 774, it was held proper to deny a temporary injunction against the enforcement of a Price Order, it being decided that no temporary injunction should issue unless a clearly irreparable injury is shown, and that there must be a clear and persuasive showing of unconstitutionality, inasmuch as an injunction should issue in those cases only in extraordinary situations. It was alleged as a ground for injunction as in the case at bar, that the citrus fruit covered by the regulation was perishable and would spoil if not sold, and that the regulation made it impossible to sell the fruit, in such a manner that the plaintiff would have to abandon his business. Yet,

it was held injunction should not issue. In a separate opinion by Mr. Justice Frankfurter, he states that the allowable exercise of legislative discretion to attain price stability finds obvious occasion in the case of a commodity as basis to a state's economy as citrus fruit is to that of Florida; that minimum prices were set as a floor so as to prevent "the destructive play of blind economic forces" and that injunction is fashioned usually for settling an ordinary clash of private interests, and should not generally be used "to restrain the machinery of a state in carrying out some vital state policy."

■ We must also consider the balance of equities. The Supreme Court of the United States has decided that even if a complainant is to suffer loss due to the operation of a Price Order or regulation, if the loss to the consumers and to the public would be greater and of more significance if the enforcement of the order were restrained, injunction should not issue, even if a highly perishable commodity is involved, it being held in that case, also, that even if the statute in question (as the statute in the case at bar) forbids the issuance of an injunction, that would not be violative of the due process clause, for the right of property, in that case, should be subordinated, in the balance of equities relevant in an injunction proceeding, to the general welfare of the people. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834. To the same effect, see Powers v. Bowles, 144 F.2d 491, certiorari denied 323 U.S. 759, 65 S.Ct. 93, 89 L.Ed. 608, in which in an opinion by Chief Judge Maris, of the United States Emergency Court of Appeals, it is held that an interlocutory injunctive relief against a price regulation should be denied, even if the regulation affects grapes, which are a seasonal perishable commodity, it being held also that there would be no deprivation of property without due process of law resulting from the denial of an injunction, since Congress, in the exercise of power to protect the national economy from destructive influences of inflation may prohibit the use of restraining orders or other interlocutory relief. See also the comment on the Yakus case in 42

Illinois Law Review 584: "Judicial Review of Price Control, the Battle of the Meat Regulations", in which it is pointed out that the meat involved in the Yakus case was highly perishable.

In the case of Wing v. Arnall, 198 F.2d 571, 575, the Emergency Court of Appeals, through Chief Judge Maris, held:

(1) Where public interest is involved, courts of equity require much stronger grounds for granting equitable relief.

(2) That in such a case temporary injunction should be denied unless the Court is convinced with reasonable certainty that the complaint must succeed at the final hearing.

(3) That, as to a Price regulation, even if irreparable injury were to be suffered by a complainant, if a public interest will be impaired which an injunction bond can not compensate, the court may, in the public interest, withhold relief. See also, Taylor v. Brown, Em.App., 137 F.2d 654, certiorari denied in 320 U.S. 787, 64 S.Ct. 194, 88 L.Ed. 473.

Even in a direct attack upon a Price Order, the fact that a complainant may suffer loss does not imply necessarily a deprivation of property without due process of law, for the due process clause should not be isolated, and should function and be interpreted in harmony with concepts of public welfare, specially when a price fixing order is substantially related to a legitimate end sought to be attained. Nebbia v. People, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 9, 79 L.Ed. 259, where it is held that loss of profits by itself does not invalidate a price regulation, for if the designation of a minimum price is within the scope of the police power, "expenses or losses made necessary thereby must be borne as an incident, unless the order goes so far beyond the needs of the occasion as to be turned into an act of tyranny." See also, Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 391, 60 S.Ct. 907, 84 L.Ed. 1263; Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190.

In the case at bar there is a substantial probability that complainant will suffer loss if injunction is not issued. But, on the other hand, if the injunction is issued, the people of Puerto Rico will suffer a greater detriment. Rice is an essential and basic element and staple in the diet of the large majority of Puerto Ricans. To restrain the enforcement of the order would imply an increase in the cost of living of consumers in this island measured, at least, by three million dollars. Price controls in the United States have been eliminated, and marketing quotas as to rice are not being applied. Hence, Puerto Rican consumers, in the absence of government regulation, would be subject to the effect of "blind economic forces" which would, not only tend to destroy the economy of Puerto Rico, but could also prevent Puerto Ricans from obtaining a minimum sustenance as human beings, if market conditions in the United States were such that prices were raised to exorbitant levels. As a further factor, the commercial balance of imports and exports is also involved. If the price of the articles Puerto Rico exports are not raised, Puerto Rico could not pay for the import of articles which may rise to disproportionate levels. Hence, even if complainant is to suffer loss, the equities in favor of the public are so overwhelming that an injunction would not be justified. I can not issue an injunction against the entire people of Puerto Rico. I can not issue an injunction which might contribute to the disruption of the economy of Puerto Rico. I should not issue an injunction which might interfere with the policies of a government which is placed in a better position than myself to consider the factors involved. This Court should accord due respect to the autonomy which the government of the Commonwealth of Puerto Rico should enjoy. Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Watson v. Buck, 313 U.S. 387, 401, 61 S.Ct. 962, 85 L.Ed. 1416; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101. I should not establish a precedent of government by injunction, in sacrifice of the essential welfare of the community.

Order No. 228 affects previous contracts made by complainant. Property

rights constitutionally protected may be acquired through contracts of purchase and sale, Gallardo v. Questell, supra. But the fact that a price regulation may affect previous contracts does not by itself invalidate the regulation or price order. Philadelphia Coke Co. v. Bowles, Em.App., 139 F.2d 349, opinion of Chief Judge Maris.

If the purchase price had been specifically mentioned and established in the contracts themselves, an allegation could be made as to the confiscatory character of the order (although in an injunction proceeding we would still have to consider the equities involved). But in this case, the purchase price was "open", that is, it was subject to market conditions in the Continental United States at the time of shipping. Under those circumstances any loss to be suffered by complainant would not depend on the 'Price Order itself, but on the conditions of supply and demand prevailing in the United States at any given·time, determinative of the market price. If, for example, the market price in the United States were to be, or were previously, lower than the price fixed in the order, no loss would ensue. In Vidal v. Fernandez, 104 F.2d 606, certiorari denied in Vidal v. Garcia, 308 U.S. 602, 60 S.Ct. 139, 84 L.Ed. 504, the Circuit Court of Appeals for the First Circuit it was held that an Act of Puerto Rico regulating contracts for the purchase and sale of cane sugar is not invalid nor confiscatory nor does it interfere with the liberty of contracts, where the market price of sugar, and not the operation of the Act, was primarily responsible for the loss of persons complaining of the Act. It was pointed out that the price of sugar in New York might change so as to prevent a loss and yield a profit.

In this injunction proceeding, in the balance of equities, it is relevant to consider who should bear the risks of the fluctuations in the market price. The people and the consumers of Puerto Rico should not assume those risks. Of course, the market price has already been determined as to deliveries already made, but the fact remains that the impact of the Order depends on a fluctuating market price. The Order is not separable, and we should not restrain its

enforcement on the basis of previous experience, for it may not produce a loss as to future deliveries. Order 228 looks also to the future, and a restraining order or injunction has its ambit in the future.

The injunction is to be denied.