## NATIONAL LABOR RELATIONS BOARD v. GONZALEZ PADIN CO.

No. 4224.

Circuit Court of Appeals, First Circuit.

May 7, 1947.

354

Ida Klaus, of Washington, D. C. (Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, ·Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Dominick L. Manoli and Charles J. Delaney, all of Washington, D. C., on the brief), for petitioner.

Hector Gonzalez Blanes, of San Juan, P. R. (Celestino Iriarte and F. Fernandez Cuyar, both of San Juan, P. R., on the brief), for respondent.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge:

Two questions are presented by this petition for enforcement of an order of the National Labor Relations Board. These are whether the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., applies to the respondent and, if it does, whether the Board's findings are supported by substantial evidence. We shall consider the jurisdictional question first.

The respondent is a Puerto Rican corporation which owns and operates a large department store in San Juan and smaller ones in Ponce and Mayaguez. During the year 1945 it imported approximately 80% of it merchandise from the United States, where it maintains a purchasing office, and it also acted as the exclusive sales agent or dealer in Puerto Rico for a number of companies located in the United States, such as Remington Typewriter Co., American Safety Razor Corp. and International Philco Corp. In the course of its· business it does not export any goods from Puerto Rico but sells only locally at retail.

The respondent contends that although it imported large quantities of merchandise from the United States, that merchandise was acquired only for local retailing and therefore lost its "interstate character" upon arrival at its stores. Hence, it says, its business was entirely local in nature and did not bring it within the jurisdiction of the Board. We do not agree. We think that even laying the respondent's imports from the United States to one side, as the Board did, (see Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 220, 59 S.Ct. 206, 83 L.Ed. 126) nevertheless the Board's jurisdiction over the respondent is well founded.

It is established by several decisions of the Supreme Court and this Circuit Court of Appeals that Puerto Rico is a completely organized territory, although not one incorporated into the United States, and that as such the power of Congress to legislate respecting it is plenary, subject only to such constitutional restrictions as apply to the situation, none of which concern us here. See Cases v. United States, 1 Cir., 131 F.2d 916, 919, 920, and the cases cited therein. Thus Congress can constitutionally regulate purely intra-territorial commerce. And we think there can be no doubt that Congress must have intended to exercise this power when in § 10(a) of the National Labor Relations Act it gave the Board authority to prevent any person from engaging in any unfair labor practice affecting commerce, and in § 2(6) of the Act defined commerce to include "trade * * * within * * * any Territory." That is to say, we think Congress in the National Labor Relations Act intended to deal comprehensively with labor disputes affecting commerce, (see N.L.R.B. v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014) just as in the Sherman Anti-Trust Act of 1890, 15 U.S.C.A. §§ 1–7, 15 note, as supplemented by the Clayton Act of 1914, 38 Stat. 730, it intended to deal comprehensively with contracts, combinations and conspiracies in restraint of trade (Puerto Rico v. Shell Co., 302 U.S. 253, 259, 58 S. Ct. 167, 82 L.Ed. 235) and to that end exercised all the power it possessed in the premises. Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204.

Nor is the Board ousted from its jurisdiction over the respondent because the Puerto Rican Legislature has seen fit to enact its own Labor Relations Act. The reason for this is that the Supreme Court in the Shell Co. case, supra, held, after full consideration, that in spite of the broad grant of legislative powers with respect to local matters contained in § 32 of the Foraker Act, 31 Stat. 83, and continued in force by § 37 of the Organic Act of 1917, 48 U.S. C.A. §§ 774, 821, a congressional statute penalizing specific local behavior and a Puerto Rican act to the same effect may nevertheless co-exist.

The basic question on the merits is whether the respondent discharged a laborer-messenger in its employ named Robles because he persistently, on the respondent's time and without its permission, took empty boxes and crates belonging to the respondent and sold them for his own personal benefit.

From the facts administratively determined by the Board in proceedings instituted by it against the respondent under § 10(b) of the Act it appears that before Robles was ever employed by the respondent he had been engaged in the business of buying and selling used wooden boxes and crates and paper shipping cartons in San Juan. This occupation brought him into contact with respondent in that the latter from time to time gave him such of its surplus containers as he could use in his business provided only that he would remove them from its premises. In 1935 the respondent employed Robles on a temporary part-time basis to help load and unload trucks calling at its San Juan store for which it gave him empty boxes and crates and paid him a few dollars per week. At Christmas time in that year or the next, the Board could not determine which, Robles was given employment as a full time "substitute" in the respondent's delivery department where he performed the usual duties of a messenger and delivery clerk, such as running errands and delivering merchandise. For these services he was at first paid four and later five dollars a week

and in addition permitted during working hours when work was slack to take away the respondent's surplus boxes, crates and cartons and sell them on his own account.

In 1942 the respondent's office manager in charge of employment, Salvador Gonzalez, changed Robles' status from that of a substitute to that of a permanent employee. This change of status involved no change in Robles' duties, but gave him an increase in pay to six dollars per week and called for his punching a time card, which he had never done before. Robles testified on direct examination, and the Board, crediting this testimony, found as a fact, that when this change was made he was called into the respondent's office and told "You are going to work as a regular employee making $1 more and you will always take care of yourself with the boxes when you have hours that there is not much rush in the store."[1] At various times after Robles was given permanent employment he received further increases in pay, none of which, however, were given for merit, until at the time of his discharge in 1944 he was earning $10 per week.

The Board found the following facts with respect to Robles' conduct during the time he was employed by the respondent on a permanent basis: "During his tenure as a permanent employee, Robles was permitted by Angel Rolan, an officer of the respondent and the general manager of that division of the store which included the delivery department, as well as by Luis Hernandez, the foreman of the delivery department and Robles' immediate supervisor, to continue his prior practice of removing surplus boxes and crates from time to time during working hours. Hernandez, called as a witness by the respondent, testified, and it is found, that at various times throughout this period, perhaps once a week or once in 2 weeks, Rolan or Hernandez would give Robles empty crates and boxes, and on such occasions would permit him during working hours to remove them from the store for the purposes of sale. The privilege granted Robles was, however, not without its limitations. Robles was prohibited from removing any boxes or crates on company time except when specifically authorized. There is evidence, credited by the undersigned, that on occasions during the course of his employment Robles exceeded the limits of his privilege by removing boxes and crates without express permission. To what extent Robles engaged in such unauthorized conduct is not clear in the record. It is clear, however, that although Robles' supervisors, Hernandez and Rolan, were aware that Robles at times engaged in this unauthorized conduct, and on occasions criticized him for it, they did not consider this of sufficient consequence to warrant their taking disciplinary action. Both Hernandez and Rolan admitted that they never reported these incidents to the office; that they neither recommended nor were consulted with respect to Robles' discharge; and, more specifically, that they never informed nor discussed with Gerardo Moledo,[2] who the respondent contends was alone responsible for the discharge, that Robles had ever removed boxes or crates without permission."

We turn now to the findings with respect to Robles' discharge and to the events leading up to that occurrence.

During the latter part of September 1944, the Union de Empleados de Comercio de Puerto Rico, affiliated with the Confederacion General de Trabajadores de Puerto Rico, referred to hereinafter as either the CGT or the Union, a labor organization admitting respondent's employees to its membership, launched a campaign to organize department store employees in the San Juan area. Robles became interested in it and was the first of the respondent's employees to join. He then assumed leadership in organizing his fellow employees. To this end he distributed union application forms to employees, usually in the square in front of the respondent's store where employees fre-

---

[1] Salvador Gonzalez denied making any such statement, and Robles himself on cross-examination testified that "The only thing" that Salvador said when giving him permanent employment was "We are going to put you one additional dollar because you behaved very well around here."

However, since it is the exclusive province of the Board to determine which version of the conversation is correct, the above finding of the Board cannot successfully be challenged here.

[2] An officer of the respondent and its cashier.

quently gathered during non-working hours, but sometimes inside the store. He also collected signed applications inside the store. These activities took place throughout the two week period preceding his discharge and during that time Robles received and transmitted 35 signed application forms to the union organizer.

While Robles was engaged in these activities he was accustomed to carry union application forms in the rear pocket of his trousers, and throughout his entire employment various of the respondent's department heads, each anxious to make sure that his deliveries were promptly attended to and not withheld in favor of others, at times removed papers which Robles was carrying in his trouser pockets for the purpose of determining what delivery receipts Robles held for them. On Saturday afternoon, October 14, 1944, Alberto Gonzalez, a department head and officer of the respondent, while searching Robles for delivery receipts, removed several union application forms from his pocket. As to what followed Robles said: "He took them out. He asked, 'Is this mine?' I said, 'No, those are application blanks for entrance to the Union of Commercial Employees.' And then he said to me, 'Are you a top leader in the CGT?' And I answered, 'I am a leader looking for justice for us, since there is none here for the workers.' Then he answered me and said, in a loud voice, in a very angry attitude, 'If the Union can't do anything for you, what can you do yourself alone for it?'"

This conversation took place between 2:30 and 3:00 p.m., shortly before Robles and his fellow employees were given their weekly pay envelopes and their time cards for the following week. Later that afternoon at about 5 p.m., upon his return from making a delivery, Robles was summoned by Hernandez, his foreman, and given a letter signed only with the name of the respondent to the effect that his position had been discontinued and that his services were no longer required. Upon Robles' testimony, some of which was not contradicted, the Board found that: "Hernandez informed Robles that he did not know why Robles was being discharged, and suggested that Robles call at the office. Upon inquiry

there, Salvadore Gonzalez told Robles, 'I don't know what is going on with you. I am just beginning to find out about it. Go and ask Moledo.' Calling on Gerardo Moledo, the respondent's cashier, Robles again failed to receive any explanation for his discharge; Moledo's only answer was, 'We don't need you any more. We are through with you. You will ask Alberto that knows about it.' Finally, as suggested by Moledo, Robles went to see Alberto Gonzalez and said, 'Alberto, what is going on? I have been fired. You know, I just came back from work and I find this surprise here.' To this Alberto Gonzalez replied, 'Well, let it not be a surprise to you and go to the CGT and ask them for a job.'"

On the basis of the foregoing, supplemented by additional findings of a secondary nature which in the interest of brevity we do not recite, the Board found that contrary to the respondent's contention Moledo, acting solely on his own responsibility, had not discharged Robles merely because he had been taking the respondent's empty boxes and crates on its time and without permission. Instead the Board found that Robles' activity on behalf of the union was known to Alberto Gonzalez, that he was a participant in, if not indeed the originator of, the respondent's decision to discharge Robles, and that the "roots" of that decision "lay in Robles' outstanding role in the recently initiated union movement to organize the respondent's employees and in the respondent's determination to frustrate the development of that movement and to discourage similar activities by its employees in the future." Consequently the Board concluded that the respondent had been guilty of an unfair labor practice as defined in § 8(1) and (3) of the Act and entered the instant order directing the respondent to cease and desist from discouraging membership by its employees in the union, or any other labor organization, to cease and desist from interfering, restraining or coercing them in the exercise of their right to self-organization, and affirmatively to offer to reinstate Robles, with back pay less net earnings and without prejudice to his rights, in his former, or a substantially equivalent position, and to post appropriate notices.

From the quotations in this opinion from the trial examiner's intermediate report; the findings, conclusions and recommendations of which the Board adopted as its own, it is evident that the findings of the Board rest in large part upon the testimony of Robles and upon inferences drawn therefrom. To be sure Robles contradicted himself in some particulars on the stand, and much of his testimony is flatly contradicted by witnesses called by the respondent whose testimony will easily support inferences quite contrary to those drawn by the Board. On the other hand Robles' testimony is corroborated in part by the testimony of some of his fellow employees. The situation presented is the familiar one of conflicting evidence from which opposite inferences may logically be drawn. Hence we cannot say that the findings of the Board are without substantial supporting evidence and from this it follows that we must sustain the findings of the Board. We therefore must assume that the respondent discharged Robles because of his activities on behalf of the union rather than because of his persistent refusal to obey orders.

Undoubtedly, therefore, the respondent committed an unfair labor practice as defined in § 8(1) and (3) of the Act, and from this it follows that the Board's order insofar as it directs the respondent to cease and desist from such practices in the future, and to post notices to that effect, must be enforced. The question remains whether the affirmative part of its order directing the respondent to offer Robles reemployment with back pay must also be enforced. Conceding that the scope of the order necessary to prevent interference with the rights guaranteed to employees by the Act is for the Board,—that "It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged"[3]—nevertheless its power in this respect is subject to our control under § 10. May Dept. Stores v. National Labor Rela-

tions Board, 326 U.S. 376, 392, 66 S.Ct. 203. And we would be inclined to refuse enforcement of an order directing a respondent to reinstate an employee who had been guilty of some flagrant dereliction of duty even though that employee had been discharged for union activity rather than for his faithlessness. That is to say, we are not prepared to announce as a blanket proposition that in every case of a discharge for union activity we would feel bound to consider an order requiring an offer of reinstatement with back pay appropriate to effectuate the policies of the Act. We would certainly hesitate, except possibly in the most extraordinary circumstances, to enforce such an order as this had the Board found Robles guilty of embezzlement, for instance.

But this is not such a case. Robles may have taken the respondent's property for his own use without permission, and in fact the Board so found, but considering the nature of that property, and the arrangement between the respondent and Robles with respect to it during the years of the latter's employment, Robles' violation of his duties as an employee becomes relatively insignificant. Certainly his breach of duty to his employer could reasonably be found susceptible of correction by means short of discharge. Under the circumstances, it does not seem to us that Robles' violation of orders was any more flagrant than the discharged employee's violation of his employer's rule against smoking in the plant which the Supreme Court in National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 330, 60 S.Ct. 918, 84 L.Ed. 1226, held not to prevent enforcement of an order such as this.

Considering the findings we cannot say that the Board's corrective measures go so far beyond its authority under § 10(c) as to require modification.

A decree will be entered enforcing the order of the Board.

[3] International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50, cited with approval in Franks Bros. Co. v. Labor Board, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020.