Euginia Medina **DETRES** et al.

v.

**LIONS BUILDING CORPORA-TION** et al.

**No. 53 C 1749.**

United States District Court
N. D. Illinois.

Nov. 21, 1955.

Joseph M. Tobias, John J. Riordan, Norval A. Brown, Chicago, Ill., for plaintiffs, Joseph M. Tobias, Chicago, Ill., of counsel.

Paul H. Heineke, Clarence R. Conklin, William H. Schrader, Chicago, Ill., for defendants Lions Bldg. Corp. and Herman Jaksch, Heineke & Conklin, Chicago, Ill., of counsel.

McKinley & Price, Louis F. Dennen, Chicago, Ill., for defendant Myrtle J. Christie.

Robert L. Brody, George J. Gore, Chicago, Ill., for defendant Paul Koger.

HOFFMAN, District Judge.

This action was brought by four surviving relatives of Juan Hipolito Gonzales Detres who was killed in an automobile accident said to have resulted from the intoxication of the driver of the car in which Detres was a passenger. The defendants are alleged to have sold the liquor which led to the intoxication of the driver and the subsequent accident. The plaintiffs' claim is based on the provisions of the Illinois Dram Shop Act, Ill.Rev.Stat.1953, c. 43, § 135. Jurisdiction of this court is predicated on 28 U.S.C. § 1332, the plaintiffs all being citizens of Puerto Rico and the defendants citizens of the State of Illinois. Two of the defendants have moved to dismiss the action on the ground that

the court does not have jurisdiction. It is their contention that Puerto Rico is no longer a territory as that term is used in Section 1332(b) of the Judicial Code (providing for diversity jurisdiction), and that if Puerto Rican citizenship should be held to be within the grant of diversity jurisdiction, Section 1332 is unconstitutional as an attempt to expand the jurisdiction which Congress may provide for the federal courts under Art. III, Sec. 2 of the United States Constitution. Notice was served on the Attorney General, pursuant to 28 U.S.C. § 2403, that the constitutionality of an Act of Congress was being challenged, but the United States declined to intervene.

As it was enacted in 1948, when the Judicial Code was revised and codified, Section 1332 provides as follows:

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $3,000 exclusive of interest and costs, and is between:

"(1) Citizens of different States:

\* \* \* \* \* \*

"(b) The word 'States', as used in this section, includes the Territories and the District of Columbia."

The defendants say that with the creation of the Commonwealth of Puerto Rico the Island may no longer be considered a territory as the term is used in this section.

Puerto Rico came to the United States by cession from Spain under the Treaty of Paris of April 11, 1899, 30 Stat. 1754, as an aftermath of the Spanish-American War. In 1900, Congress organized it under a civil government by the terms of the Foraker Act, 31 Stat. 77. This was superseded by the Organic Act of 1917, Jones Act, 39 Stat. 951, 48 U.S.C.A. § 731 et seq., which, as amended from time to time, remained the governing force in Puerto Rico until 1950. Many rights of local autonomy were enjoyed by the Puerto Ricans under the Organic Act. On July 3, 1950, the President approved Public Law 600, an Act "To pro-

vide for the organization of a constitutional government by the people of Puerto Rico." 64 Stat. 319, 48 U.S.C.A. § 731b–731e. The preamble and first section of this Act provided:

"Whereas the Congress of the United States by a series of enactments has progressively recognized the right of self-government of the people of Puerto Rico; and

"Whereas under the terms of these congressional enactments an increasingly large measure of self-government has been achieved: Therefore

"*Be it enacted* \* \* \*, That, fully recognizing the principle of government by consent, this Act is now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption."

It was also provided that the Act was to be submitted to the voters of Puerto Rico for acceptance or rejection and that upon approval the Legislature of Puerto Rico was authorized to call a constitutional convention. By Section 3 it was provided that upon adoption of the constitution by the people of Puerto Rico, the President of the United States was to transmit the constitution to Congress if he found that it conformed with the provisions of Public Law 600 and the "applicable" provisions of the United States Constitution. When approved by Congress, the constitution was to become effective in accordance with its terms. The Act also provided for the repeal of numerous sections of the Organic Act and said that the remaining sections, after the effective date of the constitution, should be known as the Puerto Rican Federal Relations Act. The "compact" offered by Public Law 600 was approved by the voters of Puerto Rico on June 4, 1951; a constitutional convention was convened, and the constitution drafted by it was ratified by the people of Puerto Rico on March 3, 1952, 48 U.S.C.A. § 731d note. The President, finding that the constitution

conformed with Public Law 600, submitted it to Congress which, with minor amendments, approved it in H.J.Res. 430, 66 Stat. 327, on July 3, 1952. The Governor of Puerto Rico proclaimed the constitution of the Commonwealth of Puerto Rico to be in force on July 25, 1952.

Prior to the adoption of the Puerto Rican constitution and the establishment of the Commonwealth, the Island was organized and governed in a manner similar to that of other territories of the United States. While its legislature was given considerable powers over matters of local concern, the framework of government was prescribed by Congress, and the Organic Act served as the constitution of Puerto Rico. The Governor (until 1948) and the justices of the Supreme Court were appointed by the President, and Congress retained the power to modify or repeal acts of the insular legislature. It was clear that Puerto Rico qualified as a Territory for purposes of acts of Congress which included the Territories. People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235; Kopel v. Bingham, 1909, 211 U.S. 468, 29 S.Ct. 190, 192, 53 L.Ed. 286; National Labor Relations Board v. Gonzalez Padin Co., 1 Cir., 1947, 161 F.2d 353; Crespo v. United States, 1 Cir., 1945, 151 F.2d 44, certiorari dismissed, 1946, 327 U.S. 758, 66 S.Ct. 520, 90 L.Ed. 991; Torres v. Hiatt, D.C.N.D.Ga.1949, 83 F.Supp. 614. The Island conformed to one of the commonly quoted definitions of a territory as a " 'portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of Congress with a separate legislature, under a territorial governor and other officers appointed by the President and Senate of the United States.' " Kopel v. Bingham, 1909, 211 U.S. 468, 475, 29 S.Ct. 190, 192. See, also, In re Lane, 1890, 135 U.S. 443, 10 S.Ct. 760, 34 L.Ed. 219; National Bank v. County of Yankton, 1879, 101 U.S. 129, 25 L.Ed. 1046.

Puerto Rico was, however, always deemed to occupy a position somewhat different from that of the territories which ultimately became states and from that of Hawaii and Alaska. It was a completely organized territory but not a territory incorporated into the United States. Kopel v. Bingham, 1909, 211 U.S. 468, 476, 29 S.Ct. 190, 53 L.Ed. 286; National Labor Relations Board v. Gonzalez Padin Co., 1 Cir., 1947, 161 F. 2d 353, 355; Cases v. United States, 1 Cir., 1942, 131 F.2d 916, 919–920, certiorari denied, Cases Velazquez v. United States, 1943, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718. The principal effect of its unincorporated status was that only certain universally applicable provisions of the federal constitution extended to Puerto Rico. Balzac v. People of Porto Rico, 1922, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627. (Sixth Amendment's guarantee of trial by jury in criminal cases applies to the Territories but not to unincorporated territory like Porto Rico); Cases v. United States, 1 Cir., 1942, 131 F.2d 916, certiorari denied, Cases Velazquez v. United States, 1943, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (due process clause of Fifth Amendment is a restriction upon Congress with respect to Puerto Rico). It was also thought to mean that Congress was under no obligation to provide ultimate statehood for Puerto Rico, as it was for the incorporated territories. Nevertheless, Puerto Rico was a territory, and unquestionably the provisions for diversity jurisdiction in Section 1332 were thought to include citizens of Puerto Rico.

In this connection, brief reference to the history of this provision is relevant. Prior to 1940 Congress had never attempted to include citizens of the territories or of the District of Columbia within the provisions for diversity jurisdiction. Only citizens of the 48 states were entitled to invoke this jurisdiction. In 1940, Congress expanded diversity jurisdiction to include suits "between citizens of different States, or citizens of the District of Columbia, the Territory of Hawaii, or Alaska, and any State or Territory." Act of April 20, 1940, 54 Stat.

143. Under this wording the present suit—between citizens of Puerto Rico and citizens of one of the states—could not have been maintained in the federal courts although a suit between citizens of Puerto Rico and citizens of Hawaii could have been. The Reviser's Notes to the Judicial Code of 1948 indicate that the diversity section, now Section 1332, was changed to provide uniformity. We interpret this to mean that a suit between a citizen of Puerto Rico (assuming it is a Territory) and a citizen of one of the states was intended to be included.

It may be noted that under the present organization of the Judicial Code Section 1332 also applies to the United States District Court for the district of Puerto Rico, which is defined as one of the district courts of the United States. 28 U.S.C. §§ 451, 119. Whether significant or not, we have been unable to find any case since 1948 where diversity jurisdiction in the district court either of Puerto Rico or of any district within the United States was specifically attributed to citizenship of Puerto Rico, on the one side, and citizenship of one of the states, on the other. Apparently the question has never arisen in the federal courts in this country. In the District Court for Puerto Rico the grant of diversity jurisdiction in Section 1332 is probably not of great significance because Section 41 of the Organic Act, 48 U.S.C.A. § 863 (which continues in force as part of the Puerto Rican Federal Relations Act) creates an additional jurisdiction in that court which is similar to diversity jurisdiction but, as a practical matter, less restrictive. This is possible, of course, because the District Court for Puerto Rico is a legislative court and not subject to the constitutional limitations applicable to federal courts created under Article III. Balzac v. People of Porto Rico, 1922, 258 U.S. 298, 312, 42 S.Ct. 343, 66 L.Ed. 627. See, also, American Insurance Co. v. Canter, 1828, 1 Pet. 511, 7 L.Ed. 242; Menashe v. Sutton, D.C. S.D.N.Y.1947, 71 F.Supp. 103. There are cases in which jurisdiction of the District Court for Puerto Rico has been upheld in a suit between a Puerto Rican citizen and a citizen of one of the states, but it was said to be authorized by Section 41 of the Organic Act, no reference being made to Section 1332 of the Judicial Code. Cepero v. Pan American Airways, Inc., 1 Cir., 1952, 195 F.2d 453, certiorari denied, 1952, 344 U.S. 840, 73 S.Ct. 50, 97 L.Ed. 653; Steinberg v. Toro, D.C.D.P.R.1951, 95 F.Supp. 791; Ruiz v. Mendez, D.C.D.P.R.1949, 86 F. Supp. 29.

It may be assumed, however, that this suit could have been maintained in this court prior to 1952, and we turn to a consideration of Section 1332 in relation to the present status of Puerto Rico.

At the outset, it should be pointed out that this is not necessarily a matter of repeal by implication, but rather the problem of attempting to determine what Congress intended or would have intended the term "Territories" to include in Section 1332. Compare West India Oil Co. v. Domenech, 1940, 311 U.S. 20, 61 S.Ct. 90, 85 L.Ed. 16.

Clearly Congress had no specific intention one way or the other with respect to the meaning of "Territories" in relation to the Commonwealth of Puerto Rico. The Judicial Code predated the establishment of the Commonwealth by several years. No hint as to the content of the term appears in Section 1332 (aside from the brief and incomplete reference in the Reviser's Notes), nor is the term "Territories" defined elsewhere in the Judicial Code. We can find no references in the legislative history of the Code (collected in Title 28 U.S.Code Cong.Service 1948, pp. 1487–2174, 80th Cong., 2d Sess., 1948, to this part of Section 1332 nor to the problem of defining "Territories". But there is evidence within the Judicial Code that Congress did not use "Territories" as a comprehensive term encompassing all the land area over which the United States exercises jurisdiction. In all other sections of the Code—with one exception, Section 2413—where such references are appropriate, Congress spoke in terms of the

Territories and Possessions. E. g., §§ 373, 411 (prior to amendment in 1951), 456, 1738, 1739, 1862, 2073, 2601. From this it may be concluded that Congress recognized that the term "Territories", as used in the Code, did not necessarily include all of the territorial possessions of the United States. This is consistent with past experience. Both the terms "Territories" and "States" have always been considered susceptible of interpretation—that is, neither has a fixed and technical meaning that must be accorded to it in all circumstances. In People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 257–259, 58 S.Ct. 167, 82 L.Ed. 235, the Supreme Court specifically recognized that the word "Territories", as used in acts of Congress, may have different meanings and that Puerto Rico may be found to be included within it in one act and excluded in another, depending on the use of the word as well as "the context, the purposes of the law, and the circumstances under which the words were employed." 302 U.S. at page 258, 58 S.Ct. at page 169. In In re Lane, 1890, 135 U.S. 443, 10 S.Ct. 760, 34 L.Ed. 219, the territory known as Oklahoma was held not to be included in the term "territories", as used in an Act of Congress, on the ground that it had not been organized into a civil government in the manner of most territories although it was an area subject to the exclusive jurisdiction of the United States. See, also, Luckenbach S. S. Co. v. United States, 1930, 280 U.S. 173, 50 S.Ct. 148, 74 L.Ed. 356 (for some purposes the Canal Zone is treated as a territory of the United States; for others, as a foreign port); Vermilya-Brown Co. v. Connell, 1948, 335 U.S. 377, 386–388, 69 S.Ct. 140, 93 L.Ed. 76; National Mutual Insurance Co. v. Tidewater Transfer Co., 1949, 337 U.S. 582, 604 ff., 69 S.Ct. 1173, 93 L.Ed. 1556 (opinion of Mr. Justice Rutledge); Mora v. Mejias, 1 Cir., 1953, 206 F.2d 377, 386. The term "territory" may be used in a broad sense as when Congress exercises its constitutional authority to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States", Art. 4, sec. 3, or it may be used in a more limited way to describe an area organized by Congress in a particular form of civil government, In re Lane, supra.

There can be no doubt that as a matter of political and legal theory, and practical effect, Puerto Rico enjoys a very different status from that of a totally organized but unincorporated territory, as it formerly was. The government of the Commonwealth of Puerto Rico derives its powers not alone from the consent of Congress, but also from the consent of the people of Puerto Rico. In accordance with the agreement "in the nature of a compact" with Congress, the people of Puerto Rico have adopted a comprehensive constitution which fully provides for the organization of the government of the Island. As Congress itself acknowledged, the people of Puerto Rico are free to change their constitution without approval of Congress so long as it remains consistent with the United States Constitution and the statutes pursuant to which it was adopted. Conference Rep. No. 2350, 82d Cong., 2d Sess. (1952), U.S.Code Cong. & Adm. News, vol. 2, 1952, p. 1902. Most of the provisions of the Organic Act restricting full self-government over local affairs have been withdrawn. The preamble to the Puerto Rican constitution, which was approved by Congress, speaks of the creation of the Commonwealth "within our union with the United States of America"; and Art. I, Sec. 1, provides:

> "The Commonwealth of Puerto Rico is hereby constituted. Its political power emanates from the people and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States of America." (The constitution is set out in full at 48 U.S.C.A. § 731d note.)

It seems to the court that the legislative history of Public Law 600 and of H. J. Res. 430 (approving the constitution)

confirms the impression that something new, although not readily definable, had been established in the relationship between Puerto Rico and the United States. The statement of the House Committee on Public Lands, H.R.Rep. 2275, 81st Cong., 2d Sess. (1950), U.S.Code Cong. Service, vol. 2, 1950, p. 2682, that, "The bill under consideration would not change Puerto Rico's fundamental political, social, and economic relationship to the United States", is not inconsistent. Many of the provisions of the Organic Act pertaining to relations between the two are continued in force. And, most importantly, the Act implied neither ultimate statehood nor ultimate independence. But consent of the governed and "full authority and responsibility of local self-government", H.R.Rep. No. 1832, 82d Cong., 2d Sess. (1952), U.S.Code Cong. & Adm.News, vol. 2, 1952, p. 1899, supplanted the absolute dominion of Congress. In the debate on approval of the constitution, Congressman McCormack, the majority leader, described this as

"a new experiment; it is a turning away from the territorial status; it is something intermediary between the territorial status and statehood." 98 Cong.Rec. 5128 (1952).

President Truman, in transmitting the constitution to Congress with his approval, said that, "The people of the United States and the people of Puerto Rico are entering into a new relationship * * * based on mutual consent and esteem." H.R.Rep. No. 1832, 82d Cong., 2d Sess. (1952), U.S.Code Cong. & Adm.News, vol. 2, 1952, p. 1902.

Evidence has been added of the recognition by our government, in all branches, of the new status of Puerto Rico. The United States, through its Ambassador to the United Nations, informed the UN in early 1953 that it no longer deemed it appropriate for this country to transmit information to the UN concerning Puerto Rico under art. 73(e) of the Charter (relating to non self-governing territories) in view of the "change in the constitutional position and status" of Puerto Rico. 28 Dep't State Bull. 584 et seq. (1953). See Magruder, The Commonwealth Status of Puerto Rico, 15 U. of Pitt.L.Rev. 1, 12–13 (1953); Mora v. Mejias, D.C.D.P.R. 1953, 115 F.Supp. 610. Congress, in Chapter 79 (Definitions) of the Internal Revenue Code of 1954, has provided a separate section, § 7701(c), for the Commonwealth of Puerto Rico, ensuring that it will be included within the term "possessions" when not incompatible with the intent of the Act.

Finally, the courts have given some attention to the effect of the creation of the Commonwealth of Puerto Rico. Judge Magruder, whose knowledge of Puerto Rican affairs is of long standing (see 15 U. of Pitt.L.Rev. 1 (1953)), had occasion to consider this in connection with another section of the Judicial Code. In Mora v. Torres, D.C.D.P.R.1953, 113 F. Supp. 309, the district court had declined, on the merits, to enjoin a local price control order on the ground that it was confiscatory and therefore a violation of due process. In affirming the lower court's denial of preliminary relief, Mora v. Mejias, 1 Cir., 1953, 206 F.2d 377, Judge Magruder called attention to the provisions of 28 U.S.C. § 2281, which requires the convening of a three judge court whenever a suit is brought to restrain the "enforcement, operation or execution of any State statute * * * upon the ground of the unconstitutionality of such statute * * *." He acknowledged that the Supreme Court had previously held that Section 2281 did not apply to the Territory of Hawaii, Stainback v. Mo Hock Ke Lok Po, 1949, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed. 741, and assumed that the decision applied as well to Puerto Rico prior to the adoption of its constitution. But in analyzing the commonwealth status of Puerto Rico and the use of the word "State" in Section 2281, he suggested that Puerto Rico might well be considered a state now for purposes of this section. The district court accepted the suggestion, holding that the Commonwealth of Puerto Rico is not a territory in the sense of Hawaii and that Section 2281 required the convening of a three judge court for the final hearing. Mora v. Mejias, D.C.D.P.R.1953,

115 F.Supp. 610. The original district court opinion in this case, 113 F.Supp. 309, is also of considerable interest. In dealing with another aspect of the case— from what source due process is applicable to acts of the local government—the court examined in some detail the events surrounding the establishment of the Commonwealth and concluded that the new status was inconsistent with that of a territory, possession or dependency of the United States. Another judge sitting on the District Court of Puerto Rico has also said, in admitted dictum, that Puerto Rico is no longer a Territory as that term is used in the Constitution and cases. Consentino v. International Longshoremen's Association, D.C.D.P.R.1954, 126 F.Supp. 420. The court held that the Taft-Hartley Act applied in that case because the industry involved was engaged in interstate commerce but said that the Act might not be valid now if applied locally within Puerto Rico, just as it may not be applied locally within a state. He also felt that Congress might have to use a term other than "Territory" in the future when it wanted to extend federal laws to the Island. Compare the decisions in Carrion v. Gonzalez, D.C.D.P.R. 1954, 125 F.Supp. 819, and Arbona v. Kenton, D.C.S.D.N.Y.1954, 126 F.Supp. 366, both holding that the Smith Act, 18 U.S.C. § 2385 (which by its terms applies to any "political subdivision" of the United States) still extends to Puerto Rico.

■ If Section 1332 were considered solely in terms of the purpose of the provision, it would probably have to be admitted that there is no reason to exclude Puerto Rico. The historical basis for diversity jurisdiction in federal courts was to make available an impartial forum in which local prejudices would not operate. A citizen of Puerto Rico would be as subject to such prejudices as a citizen of any other "foreign" state. Yet Congress made no attempt to open the federal courts to citizens of the territories or of the District of Columbia until 1940; and certainly the threat of local prejudice is not generally thought to be of as great significance today.

■ But whatever weight this factor might carry in favor of upholding jurisdiction in this case, it is offset by the undeniable fact that Puerto Rico does occupy a new and unique status today, unlike that of the other territories, by the necessity for construing diversity statutes strictly, and by the desire to avoid (if only for the present) the grave doubts as to the validity of Section 1332 if it were applied in the circumstances of this case.

In People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 259, 58 S.Ct. 167, 170, 82 L.Ed. 235, the Court held that Puerto Rico was included within the term "territory" as it is used in Section 3 of the Sherman Act, 15 U.S.C.A. § 3. This decision was prompted in large part by a recognition of the "utmost liberality of construction" that must be accorded to the Sherman Act. The very opposite is true in interpreting grants of diversity jurisdiction. Thomson v. Gaskill, 1942, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951.

Finally, there can be no doubt that the important constitutional issue in the background of this case has not been put to rest by National Mutual Insurance Co. v. Tidewater Transfer Co., 1949, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556. Probably the most that the Tidewater case settled was that for purposes of that proceeding a citizen of the District of Columbia could maintain an action against a citizen of Virginia in a federal district court under the Congressional grant of diversity jurisdiction. This result was reached when three justices, who believed that Congress may grant Article I powers to constitutional courts, joined in voting with two other justices, who would have overruled earlier decisions and hold that the word "States" in Article III includes the District of Columbia. Thus, as Mr. Justice Frankfurter pointed out:

"A substantial majority of the Court agrees that each of the two grounds urged in support of the attempt by Congress to extend diversity jurisdiction to cases involving citizens of the District of Columbia

706

must be rejected—but not the same majority. And so, conflicting minorities in combination bring to pass a result—paradoxical as it may appear—which differing majorities of the Court find insupportable." Dissenting opinion, 337 U.S. at page 655, 69 S.Ct. at page 1200.

Moreover, it is not clear that either of the minority reasons would extend to the Territories—although one court of appeals has followed Tidewater with respect to a citizen of the Territory of Hawaii. Siegmund v. General Commodities Corp., 9 Cir., 1949, 175 F.2d 952. While both the territories and the District are subject to the plenary power of Congress, there are substantial differences in the relationship of each to the federal government.

The court does not decide this issue, however, but rather holds that the Commonwealth of Puerto Rico is not a Territory as that term is used in Section 1332(b) of the Judicial Code. The motion of the defendants to dismiss for lack of jurisdiction is granted, and the complaint is dismissed.