Eugenia Medina DETRES, Hipolito De-tres, Darria Ortiz and Miriam Ortiz Detres, a minor (by Eugenia Medina Detres, next friend), Plaintiffs-Appellants,

v.

LIONS BUILDING CORPORATION and Myrtle J. Christie, Herman Jaksch d/b/a Lions Restaurant and Paul Koger, Defendants-Appellees.

No. 11686.

United States Court of Appeals Seventh Circuit.

June 13, 1956.

Joseph M. Tobias, Norval A. Brown, Chicago, Ill., for appellant.

Paul H. Heineke, Paul E. Price, Robert L. Brody, Clarence R. Conklin, William H. Schrader, Louis F. Dennen, George J. Gore, Chicago, Ill. (Arthur J. Baer, Jr., Heineke, Conklin & Schrader, McKinley & Price, Chicago, Ill., of counsel), for appellees.

Before MAJOR, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This case presents for review a decision of the United States District Court for the Northern District of Illinois, Eastern Division, which held that it did not have jurisdiction under 28 U.S.C.A. § 1332 of an action for damages based on a statute of the State of Illinois which the plaintiffs, citizens of Puerto Rico, filed against the defendants who are citizens of Illinois.

The applicable part of the diversity statute, as amended in 1948, provides as follows:

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in contro-

versy exceeds the sum or value of $3,000 exclusive of interest and costs, and is between:

"(1) Citizens of different States:

\* \* \* \* \*

"(b) The word 'States', as used in this section, includes the Territories and the District of Columbia."

The plaintiffs contend that Puerto Rico at the time this action was filed was, and still is, a Territory of the United States within the meaning of Section 1332(b), 28 U.S.C.A.

After various answers were filed the defendants filed a motion asking the trial court to dismiss the action upon its own motion for want of jurisdiction. In support of this motion the defendants alleged that in both the original complaint and in the amended complaint the plaintiffs had stated that they were citizens of the Territory of Puerto Rico; that "the former insular possession of Puerto Rico is not now, and was not on August 13, 1953, a Territory, but a Commonwealth 'within our union with the United States'"; and that therefore "Section 1332, 28 U.S.C.A. does not confer jurisdiction upon the United States District Court of an action between a citizen of a state and a citizen of the Commonwealth of Puerto Rico." In response to this motion the District Court dismissed this action, and thereafter denied the plaintiffs' motion to vacate the order of dismissal and to permit them to amend their complaint to show that they were citizens of the Commonwealth of Puerto Rico.

■ The first question presented is whether citizens of the Commonwealth of Puerto Rico are citizens of a Territory of the United States within the meaning of Section 1332, 28 U.S.C.A. There can be no doubt that citizens of Puerto Rico come within the purpose of the diversity section of the Code, which was to guard against possible discrimination by state courts in favor of resident over non-resident litigants, 54 Am.Jur., page 710, but we are admonished by many decisions that this section, granting to federal courts jurisdiction over diversity cases,

must be strictly construed. In Thomson v. Gaskill, 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951, the Court said:

"The policy of the statute conferring diversity jurisdiction upon the district courts calls for its strict construction. [Citations.] Accordingly, if a plaintiff's allegations of jurisdictional facts are challenged by the defendant, the plaintiff bears the burden of supporting the allegations by competent proof."

See also City of Indianapolis v. Chase National Bank, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47; and Trust Co. of Chicago v. Pennsylvania Railroad Co., 7 Cir., 183 F. 2d 640, 642, 21 A.L.R.2d 238. However, strict construction does not require that a plaintiff who alleges facts bringing himself within the diversity section should be denied the privilege of maintaining his action in the federal courts without an opportunity to prove the facts necessary to sustain his allegations as to diversity.

The trial court in the instant case decided as a matter of law that a citizen of Puerto Rico was not a citizen of a "territory" and was, therefore, not entitled to bring an action under the diversity section of the Code against citizens of the State of Illinois. We think this decision was erroneous.

It seems clear to us that for many years prior to July 25, 1952, when the new constitution of Puerto Rico was declared to be in force, the island of Puerto Rico, the adjacent islands belonging to the United States and the waters of those islands, had been considered by the government and the courts as a Territory of the United States.

Puerto Rico was ceded to the United States by Spain under the Treaty of Paris in 1898, 30 Stat. 1755. For a short period of time it was under military government. By the Foraker Act, 31 Stat. 77, April 12, 1900, Congress established a temporary civil government for Puerto Rico to administer local affairs and to provide revenue. That Act provided for a bill of rights, for a territorial governor

and other executive officers, and for a legislative department and a judicial department. Under the Foraker Act most of the officials for Puerto Rico were appointed by the President of the United States, with the advice and consent of the Senate, but the members of the House of Delegates, one of the two branches of the legislative assembly, were chosen by the qualified voters of Puerto Rico. The then inhabitants of Puerto Rico, with some exceptions, and their children born thereafter were declared to be citizens of Puerto Rico and entitled to the protection of the United States. Such inhabitants together with citizens of the United States residing in Puerto Rico were to constitute a body politic under the name "People of Puerto Rico." That Act provided that the laws and ordinances then in force in Puerto Rico should continue in force and effect except insofar as they were inconsistent with the applicable statutory laws of the United States and with the provisions of the Foraker Act or which were altered thereafter pursuant to the provisions of that Act.

Congress next turned its attention to the form of government for Puerto Rico in 1917. The Organic Act of 1917, 39 Stat. 951, c. 145, 48 U.S.C.A. § 731 et seq., sometimes referred to as the Jones Act, granted further local legislative powers to the government of Puerto Rico. This Act provided for the election by the qualified electors of Puerto Rico of a resident commissioner to the United States and provided that he should be entitled to receive official recognition by all departments of the United States. In the Organic Act all inhabitants of Puerto Rico, with certain minor exceptions, were declared to be citizens of the United States.

In 1947 Congress amended the Organic Act of Puerto Rico, 61 Stat. 770, 48 U.S.C.A. § 771 et seq., by providing for the election by the qualified voters of Puerto Rico of a governor, and for his impeachment and removal from office by the legislature of Puerto Rico. This 1947 Act also provided for the appointment by the governor, with the advice and consent

of the Senate of Puerto Rico, of the heads of the executive departments of the government of Puerto Rico.

In its opinion in this case the District Court, after briefly describing the government of Puerto Rico prior to 1950, said, 136 F.Supp. 699, 701:

"It was clear that Puerto Rico qualified as a Territory for purposes of acts of Congress which included the Territories. [Citation of many decisions which so held.] The Island conformed to one of the commonly quoted definitions of a territory as a 'portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of Congress with a separate legislature, under a territorial governor and other officers appointed by the President and Senate of the United States.' [Citing authorities.]"

After pointing out that while Puerto Rico was a completely organized territory but was not a territory incorporated into the United States and that, therefore, Congress was not under an obligation to provide ultimate statehood for it, the District Court said, 136 F.Supp. at page 701:

"Nevertheless, Puerto Rico was a territory, and unquestionably the provisions for diversity jurisdiction in Section 1332 were thought to include citizens of Puerto Rico."

However, in the trial court the defendants argued, and the court accepted their argument, that after the approval of the constitution for Puerto Rico and the change of the name to the Commonwealth of Puerto Rico the island could no longer be considered a "territory" as the term is used in the diversity section of the Code.

The first act by Congress granting Puerto Rico the right to a constitutional government was Public Law 600, Ch. 446, Laws of the 81st Congress, 2nd Session, 64 Stat. 319, approved July 3, 1950. That Act stated: "fully recognizing the

principle of government by consent, this Act is now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." 48 U.S.C.A. § 731b. It was provided that the Act should be submitted to the qualified voters of Puerto Rico for their acceptance or rejection; that if the Act was approved by a majority of the voters voting, the legislature of Puerto Rico was authorized to call a constitutional convention to draft a constitution for the island of Puerto Rico; and that the constitution should provide for a republican form of government and should include a bill of rights. After the adoption of the constitution by the people of Puerto Rico, the President of the United States was authorized to transmit the constitution to the Congress of the United States if he found that the constitution which was adopted conformed with the provisions of the Act and of the Constitution of the United States. Upon approval by the Congress the constitution of Puerto Rico was to become effective in accordance with its terms.

Pursuant to this Act a constitution was drafted and thereafter ratified by the voters of Puerto Rico. The preamble of that constitution stated:

"We, the people of Puerto Rico, in order to organize ourselves politically on a fully democratic basis, to promote the general welfare, and to secure for ourselves and our posterity the complete enjoyment of human rights, placing our trust in Almighty God, do ordain and establish this Constitution for the commonwealth which, in the exercise of our natural rights, *we now create within our union with the United States of America.*" (Our emphasis.) 48 U.S.C.A. § 731d note.

It is true that the new constitution vested in the people of Puerto Rico broader local legislative powers than they had theretofore enjoyed but it seems clear that the change was not sufficient to make it necessary to hold that Puerto Rico was no longer a territory within the meaning of that word as used in Section 1332 of the Code.

The preamble to the Act pointed out, as we have shown above, that the Congress of the United States by a series of enactments had progressively recognized the rights of self-government of the people of Puerto Rico and that under the terms of these Congressional enactments an increasingly large measure of self-government for Puerto Rico had been achieved. However, after the constitution of Puerto Rico was finally approved and declared to be in force, the defendants admit that there was still a "government of the United States in Puerto Rico," and that many of the statutory laws of the United States not locally inapplicable still had the same force and effect in Puerto Rico as in the United States. This is emphasized by the last line of the preamble to the new constitution which states that the changed government created by the constitution was to be "* * * *within our union with the United States of America.*" (Our emphasis.)

The legislative history of the Act providing for this last change in the government of Puerto Rico shows very definitely that those members of Congress most responsible for its enactment thought that the Act would not change Puerto Rico to some political entity other than a territory. The Senate Report explaining and recommending the passage of this bill, U. S. Code Congressional and Administrative Service, 1950, Volume 2, page 2682, stated:

"It is important that the nature and general scope of S3336 be made absolutely clear. The bill under consideration would not change Puerto Rico's *fundamental political,* social, and economic relationship to the United States." (Our emphasis.)

Again, on page 2683 of the same volume, the Report stated:

"This bill does not commit the Congress * * * to the enactment of statehood legislation for Puerto Rico in the future. Nor will it in

any way preclude a future determination by the Congress of Puerto Rico's *ultimate political status.*" (Our emphasis.)

And finally, on page 2684, the Report said of this bill:

"It would be a fundamental contribution to the art and practice of the government and administration of *Territories* under the sovereignty of the United States." (Our emphasis.)

Oscar L. Chapman, then Secretary of the Interior wrote to Senator Joseph C. O'Mahoney, Chairman of the Committee on Interior and Insular Affairs, recommending the passage of the bill. In his letter, on page 2685 of this same volume of the U. S. Code Congressional and Administrative Service, Secretary Chapman said of this bill: "The bill under consideration would not change Puerto Rico's *political * * * relationship* to the United States." (Our emphasis.)

We find in the House Report on this bill the same definite statements that the bill would not change Puerto Rico's fundamental political relationship to the United States. U. S. Code Congressional and Administrative Service, 1950, Volume 2, page 1894.

The above expressions all indicate that the persons interested in and responsible for the Act did not think that Puerto Rico was thereby being changed from a territory to some other political entity.

The mere change of the name of Puerto Rico to the Commonwealth of Puerto Rico did not change Puerto Rico from a territory to a commonwealth unless its form of government was so changed as to actually make it a commonwealth.

The word commonwealth does not have a definite, single meaning. Webster's New International Dictionary 541 (2d ed. 1953) defines commonwealth as used in American History as: "Any of the individual States of the United States. Massachusetts, Pennsylvania, Virginia, and Kentucky are officially called *commonwealths.*" The same dictionary also gives the following broader definition of

the term commonwealth: "The body of people constituting a state or politically organized community; a body politic; hence, a state, esp. one constituted by a number of persons united by compact or tacit agreement under one form of government and system of laws." This definition describes both a state of the United States and a territory such as Puerto Rico.

■ Puerto Rico both before and after the adoption and approval of its constitution was a territory of the United States within the meaning of the diversity section of the federal code of civil procedure.

The defendants finally contend that even if Puerto Rico is a territory within the meaning of Section 1332, the amendment to that Section to extend diversity to controversies between citizens of a state and citizens of a territory is unconstitutional as an extension of the judicial power of federal courts beyond the limits authorized by Article III, § 2, of the Constitution of the United States which provides that the judicial power shall extend to controversies "between citizens of different States."

In the early case of Hepburn & Dundas v. Ellzey, 2 Cranch 445, 2 L.Ed. 332, the Supreme Court, in an opinion by Chief Justice Marshall, held that a plaintiff who was a resident of the District of Columbia could not maintain an action in the federal court of Virginia against a resident of Virginia under the diversity provisions of the Judiciary Act of 1789 which granted jurisdiction to cases between citizens of different states. That decision was based on the theory that the District of Columbia was not a state within the meaning of the diversity clause of the Act. The Court there said that the word "state" was used in that Judiciary Act in the same sense that it was used in the Constitution; but the Court there also said, 2 Cranch at page 453:

"It is true, that as citizens of the United States, and of that particular district which is subject to the juris-

diction of congress, it is extraordinary, that the courts of the United States, which are open to aliens, and to citizens of every state in the union, should be closed upon them. But this is a subject for legislative, not for judicial consideration."

In the case of Corporation of New Orleans v. Winter, 1 Wheat. 91, at page 94, 4 L.Ed. 44, in another opinion by Chief Justice Marshall, the Court said:

"In the case of Hepburn & Dundas v. Ellzey, this court determined, on mature consideration, that a citizen of the district of Columbia could not maintain a suit in the circuit court of the United States. That opinion is still retained."

In the New Orleans case the Court continued, saying:

"It has been attempted to distinguish a territory from the district of Columbia; but the court is of opinion, that this distinction cannot be maintained. They may differ in many respects, but neither of them is a state, in the sense in which that term is used in the constitution."

The Court held that Winter, being a citizen of the Mississippi Territory, was incapable of maintaining a suit alone in the District Court of Louisiana.

The question of the diversity clause being applicable to citizens of the District of Columbia did not again come before the Supreme Court until it considered the case of National Mutual Insurance Co. of Dist. of Col. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556. There the federal District Court of Maryland held that it did not have jurisdiction of an action filed by a District of Columbia corporation where the jurisdiction depended solely on diversity of citizenship of the parties. The District Court for Maryland held that the diversity clause which had extended the jurisdiction to include citizens of the District of Columbia was unconstitutional and dismissed the complaint. The Court of Appeals, 4 Cir., 165 F.2d 531, affirmed and the Supreme Court granted certiorari. 333 U.S. 860, 68 S.Ct. 746, 92 L.Ed. 1139.

The Supreme Court, in an opinion written by Mr. Justice Jackson in which Mr. Justice Black and Mr. Justice Burton joined, pointed out that of the twelve District Courts which had considered the question of the constitutionality of the Act extending diversity jurisdiction to the citizens of the District of Columbia, all except three held that the Act was unconstitutional, and that the two Courts of Appeals which had considered the question had both decided that the Act was unconstitutional. The opinion by Mr. Justice Jackson expressly declined, 337 U.S. at page 588, 69 S.Ct. at page 1176, to overrule the opinion of Chief Justice Marshall in the Hepburn case, and held that the District of Columbia is not a state within the meaning of Article III of the Constitution of the United States. The opinion said, 337 U.S. at page 588, 69 S.Ct. at page 1176:

"In other words, cases between citizens of the District and those of the states were not included in the catalogue of controversies over which the Congress could give jurisdiction to the federal courts by virtue of Art. III."

But in that opinion it was reasoned that since the Constitution, by Article I, § 8, empowered the Congress to "exercise exclusive Legislation in all Cases whatsoever, over such District as may * * become the Seat of the Government of the United States," and to "make all Laws which shall be necessary and proper for carrying into Execution" such powers,

"It is elementary that the exclusive responsibility of Congress for the welfare of the District includes both power and duty to provide its inhabitants and citizens with courts adequate to adjudge not only controversies among themselves but also their claims against, as well as suits brought by, citizens of the various states." 337 U.S. at page 590, 69 S.Ct. at page 1176.

In that opinion, 337 U.S. at page 590, 69 S.Ct. at page 1176, Mr. Justice Jackson refused to accept the argument that Congress may not combine the functions under Article I with those under Article III in the District Courts of the United States or the argument "that no jurisdiction other than specified in Art. III can be imposed on courts that exercise the judicial power of the United States thereunder", and "that Art. I powers over the District of Columbia must be exercised solely within that geographic area." The opinion, 337 U.S. at page 594, 69 S.Ct. at page 1177, also directs our attention to the fact that under the power given by Article I on the subject of bankruptcies Congress has further extended the power of Article III, and that this extension has been approved by the Court in many decisions.

In this National Mutual Insurance Co. v. Tidewater Transfer case Mr. Justice Rutledge wrote a concurring opinion, with which Mr. Justice Murphy agreed, and in his opinion Mr. Justice Rutledge strongly disagreed with that part of the reasoning in Mr. Justice Jackson's opinion by which he found in Article I the power of Congress to vest in federal courts jurisdiction which was denied by the express terms of Article III. In this concurring opinion Mr. Justice Rutledge said, 337 U.S. at page 607, 69 S.Ct. at page 1185, that the reasoning in the opinion by Mr. Justice Jackson which used the Article I powers to void the restrictions placed on diversity jurisdiction by Article III would make the Constitution a "self-contradictory instrument." Mr. Justice Rutledge said further, 337 U.S. at page 625, 69 S.Ct. at page 1195:

"I cannot believe that the Framers intended to impose so purposeless and indefensible a discrimination, although they may have been guilty of understandable oversight in not providing explicitly against it. Despite its great age and subsequent acceptance, I think the Hepburn decision was ill-considered and wrongly decided. Nothing hangs on it now except the continuance or removal of a gross and wholly anomalous inequality applied against a substantial group of American citizens, not in relation to their substantive rights, but in respect to the forums available for their determination."

Mr. Justice Rutledge was of the opinion that the opinion by Mr. Justice Jackson actually overruled the Hepburn decision, and said that the Court should say so instead of trying to extend the legislative jurisdiction under Article I.

Mr. Justice Frankfurter wrote a dissenting opinion with which Mr. Justice Reed concurred. That opinion points out, 337 U.S. at page 653, 69 S.Ct. at page 1199, that "states" as used in Article III, § 2, in confining the jurisdiction of federal courts in diversity cases to controversies "between citizens of different States" had for a hundred and fifty years been held to mean "the political organizations that form the Union", and "did not cover the district which was to become 'the Seat of the Government of the United States,' nor the 'Territory' belonging to the United States, both of which the Constitution dealt with in differentiation from the States." Mr. Justice Frankfurter reasoned, 337 U.S. at page 650, 69 S.Ct. at page 1197, that the power of federal courts to adjudicate rights created by state law is limited to controversies described in Article III and that no other provision of the Constitution lends support. Mr. Justice Frankfurter said that:

"It is Article III and nothing outside it that authorizes Congress to treat federal courts as 'only another court of the State,' * * * and Article III allows it to do so only when the parties are citizens of different 'States'." 337 U.S. at page 650, 69 S.Ct. at page 1197.

And, on page 655 of 337 U.S., 69 S.Ct. at page 1200, Mr. Justice Frankfurter said further:

"But when the Constitution defined the ultimate limits of judicial power exercisable by courts which derive their sole authority from Ar-

ticle III, it is beyond the power of Congress to extend those limits."

Mr. Chief Justice Vinson wrote a separate dissenting opinion in which Mr. Justice Douglas joined. In his opinion the Chief Justice said that he agreed with the views expressed by Mr. Justice Frankfurter and Mr. Justice Rutledge which related to the power of Congress under Article I of the Constitution to vest federal District Courts with jurisdiction of suits between citizens of states and the District of Columbia, and with the views of Mr. Justice Frankfurter and Mr. Justice Jackson as to the proper interpretation of the word "states" as used in the diversity clause of Article III. In his opinion the Chief Justice, after reviewing the history of the adoption of the Constitution and its ratification by the states, said that those having most to do with the drafting and acceptance of the Constitution felt that the federal judicial power was restricted to those classes of cases set forth in Article III. Many decisions of the Supreme Court were cited to show that it had consistently held that Article III defined the limits beyond which Congress could not extend the diversity jurisdiction of the federal courts.

In our research on the questions involved in this case we have found only one opinion by a United States Court of Appeals which stated what was actually held by the Supreme Court in the National Mutual Ins. Co. v. Tidewater Transfer case as to the constitutionality of the Act which extended jurisdiction in diversity cases to citizens of the District of Columbia and citizens of the territories. That opinion, written by Chief Judge Denman in Siegmund v. General Commodities Corporation, 9 Cir., 175 F. 2d 952, at page 953, stated:

> "The National Mutual case upheld the constitutionality of the Act involved here as applied to an action between a citizen of the District of Columbia and a citizen of a state. We think that decision is controlling where the action is between citizens of a state and a citizen of the Territory of Hawaii."

The Siegmund opinion pointed out, 175 F.2d at page 954, that the power of Congress to "make all needful rules and regulations respecting the territory * * belonging to the United States" was expressly given by Article IV, § 3, Clause 2, of the Constitution. We think the Siegmund case was correctly decided and that the principles there announced apply also to the citizens of Puerto Rico.

The following District Court decisions also consider the National Mutual decision as holding that the extension of the diversity provision was constitutional: Greene v. Teffeteller, D.C.E.D.Tenn.N.D., 90 F.Supp. 387; and Menashe v. Sutton, D.C.S.D.N.Y., 90 F.Supp. 531.

In the instant case the District Court said, 136 F.Supp. 699, 705, that the constitutionality issue here in question had not been "put to rest" by the decision in the National Mutual Insurance case; that "probably the most that the Tidewater case settled was that for purposes of that proceeding a citizen of the District of Columbia" could maintain an action in the federal courts under the Act extending jurisdiction in diversity cases to citizens of the District of Columbia. But, as Chief Judge Denman pointed out in Siegmund, 175 F.2d 952, 953:

> "The reasons assigned by the two groups of Justices who concurred in the result [in the National Mutual case] are as applicable to cases involving citizens of territories as they are to cases in which citizens of the District of Columbia are parties."

We think that reasoning is equally applicable to citizens of Puerto Rico.

The judgment of the District Court dismissing this action is reversed and the cause is remanded for further proceedings not inconsistent with this opinion, including the reinstatement of the cause and the granting of the plaintiffs' motion to file within a reasonable time an amendment to their complaint alleging that at the time the original complaint herein was filed plaintiffs were citizens of the Commonwealth of Puerto Rico.